J ONES, Chief Judge,
delivered the opinion of the court:
The issue in this case is whether an award made to a Government employee under the Incentive Awards Act should be taxed as income. The question turns on whether the prize money is excluded from the plaintiffs’ gross income by the provisions of section 74(b) of the Internal Bevenue Code (26 U.S.C. § 74 (1958 ed.)).
By the terms of the Internal Bevenue Code[1] all income from whatever source derived is taxable unless it comes within specific statutory exceptions.
Section 74(b) sets out the conditions which must be met in order to bring prizes and awards within the exceptions. The paragraph is as follows:
§ 74(b) Exception. — Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement, but only if—
*86 (1) tbe recipient was selected without any action on his part to enter the contest or proceeding; and
(2) the recipient is not required to render substantial future services as a condition to receiving the prize or award.
The plaintiffs reported the prize, paid income tax thereon, filed timely claim for refund which was denied, and bring this action to recover the amount of taxes paid on the prize.
The Government Employees Incentive Awards Act was approved September 1, 1954, 68 Stat. 1105, 1113, 5 U.S.C. § 2123 (1958 ed.). Section 304 of the Act in substance authorizes the head of each department to pay cash awards and to pay necessary expenses for the recognition of civilian officers and employees of the Government who by their suggestions, inventions, superior accomplishments, or other personal efforts contribute to the efficiency, economy, or other improvement of Government operations, or who perform special acts in the public interest in connection with or related to their official employment. It also provides that the cash award shall be in addition to the regular compensation of the recipient.
Plaintiff Hobart M. Griggs was employed by the Department of Defense as a specialist in the field of transportation and freight rates. Eor several years prior to his retirement in 1957, that is between 1952 and 1957, he was a supervisor in a division of the Navy Department and was responsible for negotiating freight rates. In 1953, he and a fellow employee named Dennis Mitchell submitted to the Department a formula intended to be applicable on a nationwide basis and pertaining specifically to the transportation of rockets, rocket motors, projectiles, and projectile parts. Initially, the formula was rejected because the Assistant Secretary felt that it could not be negotiated with the railroads.
Plaintiff was, however, permitted to continue his efforts, and during the years 1953 and 1954 the taxpayer and Mitchell working together completed a study of iron and steel freight rates. They worked on the formula during their regular working hours in the Department of the Navy and in addition spent an undisclosed number of hours of their own time working on this project.
*87 They then presented charts, exhibits and statistics and the formula was approved. The taxpayer was then assigned the task of negotiating the formula with the railroads. Most of the negotiations were during his regular working hours. The taxpayer was successful in convincing the railroads of the reasonableness of the rate formula and by the end of June 1955 all of the railroads concerned put the formula into effect.
The plan made it unnecessary for rate negotiations in connection with the shipment of rockets and projectiles and resulted in a saving by the Department of Defense of several million dollars in 1955, and the indications were that there would be increased savings for the following year.
In recognition of this outstanding achievement the Department of Defense made cash awards to the taxpayer in the total amount of $7,968.75 and to his fellow worker, Mitchell, in the sum of $2,656.25.
In order to recover, plaintiffs must bring themselves within the exception set out in paragraph (b) of section 74 quoted above. We do not believe that this award is within the statutory exception.
It will be noted that prizes and awards generally are subject to the income tax. The plaintiffs say that it is either a scientific or civic award and therefore falls within the exception.
In the first place it is in reality compensation for special services rendered. It is true that the word scientific is a rather broad term. But it is used more often in connection with natural science, e.g., “biology as a science;” or “the science of astronomy, or of mind“a study of nature’s mysteries;” “profound or philosophical knowledge.” The quotations are from dictionary definitions. While we recognize that such definitions are not conclusive as to legal interpretations, they certainly indicate the meaning of such terms as normally used.
We think plaintiff’s accomplishment was of a technical rather than a scientific nature. It is true that the two terms overlap and are sometimes loosely used interchangeably and the dividing line is not always completely clear. But when the nature of the work and all the facts and circumstances *88 are considered in connection with the wording of the statute and regulations issued pursuant thereto, it seems rather clear that it was not the intention of the Congress to exempt this type of award from the payment of income taxes.
In fact it is doubtful if plaintiffs meet the additional test set out in section 74(b) (1).
In interpreting section 74(b), the Fourth Circuit in a well-reasoned opinion reached the same conclusion in reference to a somewhat different type of prize money. (Simmons v. United States, 308 F. 2d 160 (1962).)
We 'also quote from a strong opinion by Chief Judge Thomsen of the United States District Court in the same case (197 F. Supp. 673, 674 (1961)) the following:
Sec. 74 was included in the 1954 Code “to eliminate some existing confusion in court decisions over whether a prize is income or a gift and would overrule both the Pot O’ Gold case (Washburn v. Commissioner, (1945) 5 T.C. 1333) and the Boss Essay Contest case (McDermott v. Commissioner, (C.A.D.C. 1945) [80 U.S. App. D.C. 176] 150 F. 2d 585) insofar as each held prizes were not income under the 1939 Code”. Senate Report—Detailed Discussion of Bill, 1954 U.S. Cong. & Adm. News, p. 4813. That report also supports the following provision of the applicable regulation:
“Prizes and awards which are includible in gross income include (but are not limited to) amounts received from radio and television giveaway shows, door prizes, and awards in contests of all types, as well as any prizes and awards from an employer to an employee in recognition of some achievement in connection with his employment.” Reg. 1.74-1 (T.D. 6137, fd. 7-12-55). See 1954 U.S. Cong. & Adm. News, p. 4813.
Also, as to changes made by the 1954 Code, see Commissioner v. Duberstein, 363 U.S. 278, especially the footnote at page 290, from which we quote:
I.R.C., § 74, which is a provision new with the 1954 Code. Previously, there had been holdings that such receipts as the “Pot O’ Gold” radio giveaway, Washburn v. Commissioner, 5 T.C. 1333, and the Ross Essay Prize, McDermott v. Commissioner, 80 U.S. App. D.C. 176, 150 F. 2d 585, were “gifts.” Congress intended to obviate such rulings. S. Rep. No. 1622, 83d Cong., 2d Sess., p. 178.
*89 It is apparent from the letters advising plaintiffs of the award that the nature of the work performed was considered as accomplished in connection with the employment of plaintiff and Mitchell in the field of freight traffic and transportation at .the Department of the Navy. Formulating, proposing, and negotiating freight rates were included in the duties and functions outlined in their job descriptions.
The plaintiffs filed no brief in this case.
There is no doubt the taxpayer, Hobart M. Griggs, performed a valuable service that resulted in large savings to the Government. He should be and was honored and rewarded for this accomplishment. In a letter dated November 5, 1956, advising plaintiff of the award, the Secretary of the Navy stated that “This is the first award above $5,000 which has been approved by the Civil Service Commission under .the Government Employees’ Incentive Awards Act and is the highest award paid for an employee contribution under the new Government-wide program.”
We find, however, that the award does not meet the conditions set out in the provision for excepting certain types of prizes and awards from payment of the income tax.
Plaintiffs’ petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, Hobart M. Griggs (hereinafter sometimes referred to as “Griggs”) and Gladys B. Griggs, are husband and wife, citizens of the United States and residents of Alexandria, Virginia.
2. During the period from May 1, 1949, to May 18, 1957, plaintiff, Hobart M. Griggs, was employed by the Department of the Navy as a Transportation Specialist and Freight Traffic Officer, with career status in the classified civil service. Details relative to the positions held and duties performed by Griggs are briefly summarized below:
(a) From May 1, 1949, to August 19, 1951, he held the position of Transportation Specialist at grade CAF-10. In tins position, he served as Assistant Chief of the *90 Commerce and Freight Bate Branch and as Chief of the Bate Adjustment Section, one of the sections within the Commerce and Freight Bate Branch. The principal responsibility of the Bate Adjustment _ Section was to obtain, through negotiation with carriers, the most efficient freight service at the lowest possible rates. (See Defts. Ex. 27 for complete job description.)
(b) From August 19, 1951, to November 25, 1951, he held the position of Transportation Officer at grade GS-11. In this position, he acted as principal technical transportation advisor to the Navy Commerce Counsel. He advised and assisted the Navy Commerce Counsel in freight rate matters where formal legal action was taken or being considered. (See Defts. Ex. 28 for complete job description.)
(c) From November 25, 1951, to December 7, 1952, he held the position of Transportation Specialist at grade GS-12. In this position he served as Chief of the Commerce and Freight Bate Branch. His duties included formulating procedures for obtaining reasonable freight rates and negotiating such rates with the carriers. He supervised three sections: the Bate Adjustment Section, which also negotiated freight rates; the Freight Classification Section, which classified Navy materials to determine the appropriate freight rate on shipment ; and the Bate Quotation Section, which computed and quoted freight rates for Navy procurement offices. The primary function of this Branch was to obtain, through negotiation with carriers, maximum value for every dollar paid for Navy freight transportation. In this position, Griggs supervised 24 men, all of whom were engaged in dealing with freight rates and transportation of naval material and supplies. (See Defts. Ex. 29 for complete job description.)
(d) From December 7,1952, to September 11,1955, he held the position of Freight Traffic Officer at grade GS-13. In this position, he served as senior civilian of the Freight Bate and Classification Division which was responsible for negotiating preferential freight rates, transit privileges, and other accessorial charges, the determination of and negotiation of equitable classification descriptions and ratings, the quoting of available freight rates, and the maintenance of a tariff file system. (See Defts. Ex. 18 for complete job description.)
(e) From September 11, 1955, to May 18, 1957, he held the position of Supervisory Freight Traffic Officer at grade GS-13. His duties were similar to those performed with respect to his prior position as Freight Traffic Officer, supra.
*91 3. Tlie traffic management functions of tlie Department of tbe Navy, Army and Air Force in tbe Department of Defense were transferred to tbe Military Traffic Management Agency in tbe Department of tbe Army. Griggs was appointed Supervisory Freight Traffic Officer witb tbis Agency at grade GS-13, effective May 18,1957, and be beld tbis position until bis retirement from Government service on August 31, 1957. In tbis position, Griggs served as Assistant Chief of tbe Negotiations Branch, conducted negotiations witb carriers on freight rates, and administered tbe traffic management program for tbe Department of Defense.
4. Dennis Mitchell was employed by tbe Department of tbe Navy, with career status in tbe classified civil service, from April 27, 1951, imtil his retirement on March 21,1955. Details relative to tbe positions held and duties performed by Mitchell are briefly summarized below:
(a) From_ April 27, 1951, to November 26, 1952, be beld the position of Traffic Manager at grade CAF-9. In tbis position, be served in tbe Bate Adjustment Section. Iiis duties included analyzing rate situations, negotiating witb carriers, preparation of exhibits and charts concerning various rates for use in negotiations and drafting rules and regulations. (See Defts. Ex. 30 for complete job description.)
(b) From November 26,1952, until bis retirement on March 21, 1955, be beld tlie position of Freight Traffic Officer at grade GS-9. His duties were similar to those performed by him while in his position of Traffic Manager, supra.
5. (a) In April 1953, a rate formula proposal devised by Griggs, assisted by Dennis Mitchell, a fellow employee whose work was supervised by Griggs, during the course of their regular duties, was docketed witb tbe Department of the Navy. Tbis formula was applicable on a nationwide basis and pertained specifically to the transportation of rockets, rocket motors, projectiles and projectile parts.
(b) Tbe formula was strongly opposed within tbe Department of Defense by one of tbe three Armed Services which made a counter-proposal. Although this counter-proposal formula produced higher transportation charges, the Assistant Secretary of Defense decided in favor of it *92 because be was persuaded tbat the so-called Griggs-Mitchell formula could not be negotiated with the railroads to a favorable conclusion.
(c) Griggs was dissatisfied with this decision and formulated a plan of action to develop additional information and data in an effort to bave the decision reversed and obtain approval of the Griggs-Mitchell proposal. Griggs was authorized by the Department of the Navy to proceed with his rate formula project. During the years 1953 and 1954, Griggs and Mitchell collaborated in making a complete study of iron and steel freight rates, and Mitchell made numerous charts under Griggs’ guidance for use in presenting the study to the Office of the Secretary of Defense. Griggs and. Mitchell devoted many hours of their own time to the preparation of this study, and Griggs testified they used an undisclosed amount of annual leave in doing research work in reviewing records and reports of the Interstate Commerce Commission in order to obtain basic information necessary for them to evaluate certain aspects of their study, such as rates charged, car-mile earnings and transportation costs. In this connection, Griggs testified, on cross-examination, that “he hardly had enough annual leave to take a vacation those couple of years (1953-1954) because he used it up the other way (performing research work at the Interstate Commerce Commission).” There is no documentary or other evidence of record supporting Griggs’ testimony regarding the use of annual leave on this project by either Griggs or Mitchell, nor is there any showing of the amount of time they spent on this project after regular business hours. Much of the information required in making the study was “already available” in their “own intimate knowledge of transportation rates.” Certain information obtainable from shipping documents, IBM data as to tonnages, flow and concentration of traffic, was requested and obtained by Griggs and Mitchell from various sources within the Department of Defense. Griggs testified the services of about two persons, working full time for approximately ten days, was all the time required to collect the information supplied. The information and data compiled had to be analyzed, checked and correlated. Undoubtedly, Griggs and Mitchell *93 discussed their formula proposal many times and spent considerable time in the preparation of the study and on the formula project during their regular working hours at the Department of the Navy.
(d) While it appears Griggs and Mitchell started work on their freight rate formula project sometime in the year 1953, the record on this point is not clear, nor does it show how much time was spent by them on the project prior to the time the formula was docketed with the Navy Department in April 1953. It is clear, however, that Griggs and Mitchell commenced their intensive efforts on the project and performed the research work done theron at the Interstate Commerce Commission subsequent to the time the formula was originally rejected along in April 1953.
(e) In August 1954, Griggs and Mitchell submitted the Griggs-Mitchell rate formula proposal to the Joint Bate and Bate Negotiation Committee of the Office of the Assistant Secretary of Defense, and presented the exhibits, charts and statistics collected during the course of their study. After a series of meetings, the Joint Committee approved the proposal that the rates on projectiles, projectile parts, rocket heads and rocket motors be negotiated under “Column 3214 of the 28300 rates at 60,000 pounds minimum and Column 35 of the 28300 rates with a 40,000 pound minimum”, and the Department of the Navy was authorized to present this rate formula proposal to the railroads for consideration.
(f) Griggs was designated to discuss the proposal with representatives of the Southwestern and Western Begional Committees of the railroads who were sent to the Navy Department in Washington to consider the matter. These railroad representatives reported back to the Southwestern and Western Bailways, and they recommended adoption of the Griggs-Mitchell proposal. This action on the part of these railroads resulted in the other railroad groups approving the proposal in an expeditious manner. Griggs was primarily responsible for negotiating with the railroads; but although he held discussions with company representatives during a few lunch hours, most of the negotiations were conducted during regular official business hours. Some *94 travel outside of Washington in connection with these negotiations was necessary, and Griggs performed such travel as a part of his regular duties at Government expense. Griggs was highly successful in convincing the railroads of the reasonableness of the rates produced by his formula, and before the end of .June 1955, all of the railroads in the various territories throughout the nation had approved the rate formula, and it was put into effect with the sanction of all of the Armed Services under the Department of Defense.
6. The adoption and use of the Griggs-Mitchell formula by all of the railroads and Armed Services within the Department of Defense constituted a permanent change in operations which eliminated the necessity for rate negotiations throughout the United States from time to time, with respect to the shipment of rockets and projectiles, and resulted in annual savings by the Department of Defense in excess of $10 million during the year 1955. A representative of the Department of the Navy testified to the effect that the savings in freight transportation charges resulting from the use of the Griggs-Mitchell formula would, in future years, exceed the amount effected during the year 1955.
7. The Department of Defense, in recognition of the achievement of Griggs and Mitchell (described in findings 5 and 6, supra), made cash awards to them in the amounts and on or about the dates indicated below:

Amounts Received Amounts Received Date of by Mitchell Receipt

$75. 00 Sept. 19, 1955 $225. 00
1,175. 00 July 5, 1956 3, 525. 00
1, 406. 25 Nov. 15, 1956 4, 218. 75
7, 968. 75 2, 656. 25
8.The awards were made pursuant to Section 304(a) of the Government Employees’ Incentive Awards Act, c. 1208, 68 Stat. 1105, 1112, which provides, in pertinent part:
The head of each department is authorized to pay cash awards to * * * civilian officers and employees of the Government who by their suggestions, inventions, superior accomplishments, or other personal efforts contribute to the efficiency, economy, or other improvement *95 of Government operations or who perform special acts or services in the public interest in connection with or related to their official employment.
9. Defendant sharply disputes plaintiffs’ contention that the awards were made to Griggs and Mitchell “in recognition of [their] outstanding civic and scientific achievement, ranking no lower in importance than the achievements of recipients of Nobel, Pulitzer and Maria Moors Cabot awards.” In support of the contention that these awards were civic in character, plaintiffs referred to a letter dated August 29, 1956, sent by the Chairman of the U.S. Civil Service Commission to the Assistant Secretary of Defense advising that the awards recommended for Griggs and Mitchell had been approved and quoted the following therefrom:
* * * These savings will of course continue to accrue to the taxpayer in succeeding years.
Please convey my congratulations to Mr. Griggs and Mr. Mitchell for their outstanding accomplishment, and to the Navy Department and your own office for appropriately rewarding these men. I am sure that all personnel in the Department of Defense, as well as all other federal workers and the citizenry at large, will take pride in their aohievementT [Emphasis supplied at request of plaintiffs.]
In support of the contention that the achievement was of a scientific nature, plaintiffs referred to testimony of the Naval Commander who recommended the awards in which he stated, in part, that the Griggs-Mitchell formula was “technical” in character and that the formula was a “mathematical formula”. The plaintiffs quote the definition of “mathematical” as it appears in Webster’s New World Dictionary as “having the nature of, or concerned with mathematics”, and point out that the term “mathematics” embraces the “group of sciences * * It is true that numbers were used in the formula and in that sense it was mathematical. But the formula was concerned with freight rates and had no other application, significance or anything else to do with the science of mathematics. There is no evidence of record that the awards were characterized as being “civic” or “sci *96 entific”, nor at any time did those responsible for the awards refer to them as having been made in recognition of a “religious, charitable, scientific, educational, artistic, literary or civic achievement”. [Emphasis supplied at request of plaintiffs.]
10. (a) The awards made to Griggs and Mitchell in the year 1955 were for “sustained performance”. The awards made to them during the year 1956 were “superior accomplishment group awards”, approved by the T7.S. Civil Service Commission, 75 percent to Griggs and 25 percent to Mitchell, for “superior achievement”.
(b) In a letter dated September 19,1955, advising Griggs of the initial award to him, Bear Admiral B. J. Arnold, Chief of the Bureau of Supplies and Accounts in which Griggs was employed, stated, in part:

Because of your vision and wealth of experience, you were able to initiate this undertaking. Your planning and research together with the exhibits resulted in your effective presentation of factual data and evidence which removed serious objections to the proposal. As a result of this successful negotiation of freight rates there will accrue to the Department of Defense annual savings amounting to $10,000,000. Your achievement certainly exemplifies the highest type of civil service.
I extend congratulations to you on earning this award.
Your case is being forwarded to the Office of Industrial Belations for review by the Navy Incentives Award Board for consideration for additional award commensurate with the savings effected.
(c) In. a letter dated July 5,1956, advising Griggs of the second portion of the award (the first of the two awards made to Griggs during the year 1956), the Assistant Secretary of the Navy stated, in part:
* * *' the Navy Incentive Awards Board has evaluated your contribution in connection with freight rate negotiations between the railway industry and the Department of the Navy which resulted in the Department of Defense saving millions of dollars annually, and has approved an award of three thousand five hundred twenty-five dollars as your share of an additional award totaling forty-seven hundred dollars. This award is in *97 addition to the two hundred twenty-five dollars previously granted to yon by the Bureau of Supplies and Accounts. In keeping with controlling Department of Defense and Civil Service Commission incentive awards regulations, the Navy Incentive Awards Board has recommended that your exceptional contribution to economy and efficiency in Government be given further award consideration under award granting authority vested in the Commission.
On behalf of the Navy, I wish to commend you for the initiative and resourcefulness which you have demonstrated in this joint achievement. The Navy appreciates your valuable contribution which constitutes a noteworthy improvement in the operations of the military services. I hope you will continue your endeavors which have proven so unusually advantageous to the Government and in the best interest of the military establishment.
*****
(d) In a letter dated November 15, 1958, advising Griggs of the third and final portion of the award (the second of the two awards made to Griggs in the year 1956), the Secretary of the Navy stated:
It gives me great pleasure to present you this award of $4,218.75 which is the final portion of the incentive award of $10,625 granted to you and Mr. Dennis Mitchell for your improvement contribution which led to an annual saving of more than $10,000,000 to the Government in reduced freight rates.
This is the first award above $5,000 which has been approved by the Civil Service Commission under the Government Employees’ Incentive Awards Act and is the highest award paid for an employee contribution under the new Government-wide program. It is particularly significant that this award represents a contribution which resulted in benefits to the three military services within the Department of Defense.
It is very gratifying to me, personally, that we have in the Navy a device such as the Incentive Awards Program which offers incentives to encourage the submission of improvement contributions by our employees and, at the same time, provides an orderly procedure for the receipt and consideration of such contributions.
The ingenuity, perseverance, and initiative which you have displayed has achieved a result which reflects great *98 credit not only to yourself but also to the Bureau of Supplies and Accounts and to the Navy.
I express to you my appreciation for your outstanding contribution to a more efficient Navy and extend my heartiest congratulations for a job exceedingly well done,
(e) It is apparent from these letters and the entire record that the achievement of Griggs and Mitchell was considered as having been accomplished in connection with their employment in the field of freight traffic and transportation at the Department of the Navy. Formulating, proposing and negotiating freight rates were included in the duties and functions outlined in their job descriptions. (See findings 2 and 4, sufra.) It also is clear that Griggs and Mitchell demonstrated “initiative and resourcefulness” and made a very “valuable contribution which constituted a noteworthy improvement in the operations of the military services”, and that their endeavors proved unusually “advantageous to the Government and in the best interest of the military establishment.” It was in recognition of this achievement that Griggs and Mitchell were granted cash Incentive Awards designed to encourage “civilian officers and employees of the Government” to submit “suggestions”, achieve “superior accomplishments” or make “other personal efforts” which “contribute to the efficiency, economy or other improvement of Government operations”. (See finding 9, supra.)
11. The awards to Griggs and Mitchell were made on the basis that their “achievement” was considered a “superior accomplishment”. Pertinent Navy Civilian Personnel Instructions relating to Incentive Awards are quoted below:
1-7. DEFINITION OF “EMPLOYEE CONTRIBUTION.” * * * the term “employee contribution” means:
(1) A suggestion, invention, superior accomplishment, or other personal effort which contributes to the efficiency, economy, or other improvement of Navy or Government operations, or [Emphasis Supplied]
V íj» *¡»
b. Superior accomplishment. — * * * is an employee contribution (achievement, performance, invention, special act, or service) which is over and above the normal job expectancy of the individual employee or group of *99 employees. * * * A superior accomplishment may be one of the following:
(1)Superior achievement. — An achievement or performance (other than sustained superior performance) by an employee or group of employees which has resulted in dollar economy or other benefit to the Government.
% if: %
5-4. EVALtTATXON GUIDE LINES EOR AWARD CONSIDERATION. — ■ * * *
a. The following factors will serve as guide lines for the appraisal and evaluation of superior accomplishments :
(1) The degree to which the employee’s contribution exceeds the normal requirements of the work for which he is being paid.
(2) The amount of savings, if any, that exceeds savings expected from normal job expectancy; or the magnitude of the accomplishment in relation to the employee’s job responsibilities. Normally, higher level employees will be expected to effect more significant improvements and/or larger savings than employees in the lower grades.
(3) The degree of ingenuity reflected in the employee’s contribution.
(4) The extent to which an employee’s contribution has a beneficial effect outside his immediate installation.
# ^ % % #
It would appear from the evidence that all of the above factors were considered in connection with the awards made to Griggs and Mitchell.
12. The Griggs-Mitchell rate formula was implemented as a permanent change subsequent to the time Mitchell retired from Government service.[2] No further action was required of or performed by either Griggs or Mitchell with respect to their freight formula project after it was adopted in June 1955. Although the application of the formula required some technical skill, Griggs did not have the re-sponsiblity for seeing that the formula was applied correctly in connection with the various carriers who performed and carried commodities for the Government. The parties agree *100 and the record shows that neither Griggs nor Mitchell were “required to render substantial future services as a condition to receiving the prize or award(s) ” made to them. (See footnote 1, supra.)
13. It is undisputed and the evidence of record shows that neither Griggs nor Mitchell were selected for the awards made to them because of “any action on [their] part to enter the contest or proceeding.”
14. Griggs received no promotion in grade at any time after the Department of the Navy gave its consent in April 1953, for him to proceed with his rate formula project. He held only a GS-13 position from December 7, 1952, until his retirement from Government service on August 31,1957. (See finding 2, supra.)
15. Plaintiffs timely filed with the District Director of Internal Eevenue, Kichmond, Virginia, a joint Federal Income Tax Beturn for the calendar year 1956, reporting thereon an adjusted gross income of $17,478.12, and a net tax liability of $3,515.61 which sum was duly and timely paid by plaintiffs prior to April 15,1957.
16. The adjusted gross income of $17,478.12, reported in the joint Federal Income Tax Beturn filed by plaintiffs for the calendar year 1956 included salary payments totaling $9,420.06 received by plaintiff, Hobart M. Griggs, during that year from the Department of the Navy, and also the sum of $7,743.75 which amount represents the total cash awards received by him from the Department of Defense during this calendar year.[3]
17. The parties stipulated that the amount of income tax attributable to the inclusion of the cash awards made by the Department of Defense to Griggs in plaintiffs’ gross income for the calendar year 1956 and the principal amount sought to be recovered in this action is $2,092.38. The parties agreed that in the event the court determines that the cash award moneys received by plaintiff, Hobart M. Griggs, during the year 1956 are not includable in gross income for that *101 year, plaintiffs will be entitled to recover said sum of $2,-092.38 in tax refund money, together with interest according to law from April 15,1957.
18. Plaintiffs timely filed a claim for refund of the income tax for the year 1956 with respect to the cash awards received by Hobart M. Griggs during that year. The claim contains the following statement:
This contention is based on the fact that this award was in the nature of awards for scientific or civic accomplishments, and not contingent upon the rendering of any future service. It is true that the special awards to Government employees. are in appreciation for some outstanding service, but since they are not based on future services, it would seem that the recipient has no contractual agreement for an amount over and above his normal salary. Had the accomplishment not been recognized by a gift on the part of the Government the employee would have no recourse, but would merely have to be content with the fact that he had performed to the best of his ability as he had taken an oath so to do when he became a civil servant.
19. On September 24,1958, a statutory notice of disallowance in full was issued and given to plaintiffs by the Commissioner of Internal Revenue with respect to plaintiffs’ claim for refund in the amount of $2,092.38.
20. No part of the amount of the 1956 income tax paid by plaintiffs and collected by defendant with respect to said cash awards has been repaid or credited to plaintiffs by defendant, and there are no offsets or counterclaims against plaintiffs.
21. Plaintiffs timely filed their petition in this action with the Court of Claims on February 16,1959.
22. Plaintiffs are the sole owners of the claim asserted herein by them and they have not assigned or transferred such claim or any part thereof or interest therein.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is therefore dismissed.

 26 U.S.C. § 61(a) (195:8 ed.).

 As noted in finding 4(b), supra, Mitchell retired from Government service on March 21, 1955.

 Although the parties stipulated the adjusted gross income of $17,478.12 included salary payments totaling $9,420 received by Griggs from the Department of the Navy,, and $7,743 which they agreed was the total amount of the cash awards received by Griggs in 1956, these figures clearly are in error, and the correct figures, as shown by the evidence of record, are set forth in this finding.