Miguel FIGUEROA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 01–457C.

United States Court of Federal Claims.

June 28, 2005.

Heath W. Hoglund, San Juan, Puerto Rico, attorney of record for plaintiff and Robert H. Rines, Concord, New Hampshire. Samuel F. Pamias–Portalatin, of counsel.

Brian A. Mizoguchi, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director.

Michael B. Briskin, U.S. Patent and Trademark Office, of counsel.

## OPINION AND ORDER

FUTEY, Judge.

Plaintiff, an inventor who applied for a patent,[1] filed a complaint under the Tucker Act, 28 U.S.C. § 1491, against the United States on August 7, 2001, alleging that Congress' practice of using money generated from patent application fees paid to the United States Patent and Trademark Office ("USPTO") for purposes other than supporting USPTO operations (1) violated the Intellectual Property Clause of the Constitution, (2) worked an unlawful taking, and (3) constituted an illegal direct tax. Plaintiff sought to certify a class of similarly situated plaintiffs and prayed that the court "[d]eclar[e] the past and continued diversion of patent fees" to be unconstitutional, enjoin any future diversions, and order the return of any diverted fees to USPTO or to plaintiff and other class members. Defendant moved to dismiss for lack of jurisdiction or, alternatively, for failure to state a claim upon which relief could be granted. The court dismissed plaintiff's direct tax claim for failing to state a claim, and granted summary judgment to defendant on the unlawful taking claim. *Figueroa v. United States,* 57 Fed.Cl. 488, 503, 505 (2003). The court, however, construed plaintiff's first claim as an allegation of an illegal exaction over which it had jurisdiction. *Id.* at 495–96. The court then held that the introductory language of the Intellectual

Property Clause substantively limited the power of Congress to legislate since patents can only be issued for useful inventions and that, therefore, plaintiff had stated a claim for which relief could be granted. *Id.* at 499, 500–01. The court held that it would review the illegal exaction claim to determine whether the diversion of patent fees to non-patent purposes was necessary and proper to the promotion of the progress of the useful arts, but would do so with substantial deference to the authority of Congress in that sphere. *Id.* at 501. In addition, the court held that only those persons who paid patent fees since August 8, 1995 would potentially have standing because the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501, is a jurisdictional requirement that must be construed strictly. *Id.* at 493, 495.

Thereafter, the parties filed cross-motions for summary judgment on the illegal exaction claim, and the American Intellectual Property Law Association submitted an *amicus* brief. Plaintiff also filed an alternative motion for additional discovery. The court heard oral argument on the summary judgment motions on May 13, 2005.

### Factual Background

Under the Patent Act of 1952, Pub.L. No. 82–593, 66 Stat. 792 (1952) (codified as amended at 35 U.S.C. § 1, *et seq.*), Congress has established USPTO as an agency within the Department of Commerce and subject to the policy direction of the Secretary of Commerce, but otherwise independent regarding its own operational management and administration, budget allocations and expenditures, personnel decisions and processes, and procurement. 35 U.S.C. § 1(a). USPTO is "responsible for the granting and issuing of patents and the registration of trademarks." § 2(a)(1).

A filing fee must accompany every patent application, and failure to submit the fee in a timely manner will be grounds for USPTO to regard the application as abandoned. See 35 U.S.C. § 111(a). Congress has required that the USPTO Director assess application fees

---

1. Plaintiff filed his patent application on February 27, 2001, and he received Patent No. 6,484,-923 on November 26, 2002. The invention was a hand-held flux and solder tool designed to form joints on copper pipes.

according to a schedule and has also required the assessment of patent maintenance fees at certain times after the grant of a patent application. § 41. Failure to pay the required maintenance fee in a timely manner will result in the expiration of the patent. § 41(b). "All fees for services performed by or materials furnished by" USPTO and "all appropriations for defraying the costs of the activities of" USPTO "will be credited to the Patent and Trademark Office Appropriation Account in the Treasury of the United States."[2] § 42. "To the extent and in the amounts provided in advance in appropriations Acts, fees authorized ... to be charged or established by the Director shall be collected by and shall be available to the Director to carry out the activities of the Patent and Trademark Office." § 42(c).

During the first part of the Twentieth Century, USPTO was virtually self-supporting.[3] As time went on, fee receipts, as a percentage of operating costs declined substantially until, by 1982, fees offset only 23 percent of operating expenses.[4] Beginning in 1982, Congress authorized USPTO to recover operating costs from fee income and allowed it to retain the fee income as offsetting collections.[5] By fiscal year 1991 ("FY-91"), USPTO was essentially funded entirely by user fees.[6]

In 1990, Congress passed the Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. No. 101–508, 104 Stat. 1388 (1990), which was intended to limit increases in discretionary spending and reduction in receipts to the Federal Government. Section 10101 provided that USPTO would collect patent applica-

tion fee surcharges that would be credited to a particular Treasury account. Although Congress apparently intended for USPTO to continue to fund most of its operations through the fees that it collected, see, e.g., H.R. REP. NO. 101–881 at 159–60 (1990), U.S.Code Cong. & Admin.News 1990, pp. 2017, 2167–68; H.R. REP. NO. 102–382 at 7–8, Congress has not given up its control of the USPTO budget, and there is no dispute that Congress has not appropriated to USPTO for its operations all of the fees USPTO has collected. How much money is involved is a matter of dispute, as is whether the money previously collected is still available for appropriation.

Plaintiff complains specifically that Congress diverted a total of approximately $233.5 million in patent fees for purposes of deficit reduction over the period of FY–92 through FY–98.[7] Plaintiff also alleges that, in FY–99, Congress rescinded, for purposes of deficit reduction, USPTO's authority to spend $71 million in patent fees, and rescinded authority in following years to spend an additional total of $5 million in patent fees to support the United States steel industry, to provide tuition support for District of Columbia residents, and for homeland security.[8] Lastly, plaintiff alleges that Congress has continued to divert[9] patent fees for purposes of deficit reduction, although plaintiff has not been able to provide a specific sum.[10] An examination of the motions, however, shows that this latter amount could be at least $113 million,[11] making the total amount of patent fee diversions at least $422.5 million.

---

2. "An appropriation is *per se* nothing more than the legislative authorization prescribed by the Constitution that money may be paid out at the Treasury." *Campagna v. United States*, 26 Ct.Cl. 316, 317, 1800 WL 1775 (1891); see also BLACK'S LAW DICTIONARY 110 (8th ed.2004) (Appropriation is "[a] legislative body's act of setting aside a sum of money for a public purpose;" and "[t]he sum of money so voted.").

3. Plaintiff's Appendix ("Pl.'s App.") at 16 (Aug. 20, 2004).

4. *Id.*

5. *Id.*

6. *Id.* at 10.

7. Plaintiff's Motion ("Pl.'s Mot.") at 6, 22.

8. *Id.* at 7, 10 (citing Pub.L. No. 105–277, 112 Stat. 2681 (1998); Pub.L. No. 106–51, 113 Stat. 252 (1999); Pub.L. No. 106–113, 113 Stat. 1501 (1999); Pub.L. No. 107–206, 116 Stat. 820(2002)).

9. For ease of reference, the court refers collectively to all these diversions and rescissions as "diversions."

10. See Summary Judgment Oral Argument Transcript ("Summ. J. Tr.") at 29.

11. Pl.'s Mot. at 22–23.

Plaintiff has alleged that, from FY–91 through FY–00, 2.2 million patent applications were filed with USPTO while 1.2 million patents were issued.[12] In addition, in FY–90, 174,711 patent applications were filed. 104,179 patent applications were pending that same fiscal year. In FY–00, the numbers had grown so that 311,807 patent applications were filed that year and 308,056 were pending. Average patent pendency in FY–90 was 20 months, but had increased to 25 months by FY–00. Plaintiff has alleged that Congress' failure to appropriate to USPTO the full amount that USPTO has collected in fees is, at least partly, responsible for the lengthened pendency period and application backlogs.

The language of the appropriation paragraph for USPTO for FY–04 is fairly typical of the language Congress has used since FY–91[13]:

For necessary expenses of the United States Patent and Trademark Office provided for by law, including defense of suits ..., $1,222,460,000, *to remain available until expended,* which amount shall be derived from offsetting collections assessed and collected pursuant to 15 U.S.C. [§ ]1113 and 35 U.S.C. [§ ]41 and 376, and shall be retained and used for necessary expenses in this appropriation: Provided, That the sum herein appropriated from the general fund shall be reduced as such offsetting collections are received during fiscal year 2004, so as to result in a fiscal year 2004 appropriation from the general fund estimated at $0: Provided further, That during fiscal year 2004, should the total amount of offsetting fee collections be less than $1,222,460,000, the total amounts available to the United States Patent and Trademark Office shall be reduced accordingly ....

Pub.L. No. 108–199, 118 Stat. 3 (2004) (emphasis added).[14]

"Appropriations are made for one year only," unless an appropriation act specifically states that a particular sum of money "shall be available until expended." *Norcross v. United States,* 142 Ct.Cl. 763, 766, 1958 WL 7367 (1958); see also *Am. Fed'n of Gov't Employees, AFL–CIO, Local 1647 v. Fed. Labor Relations Auth.,* 388 F.3d 405, 409 (3d Cir.2004) (Congress may authorize appropriations that continue for more than one year). Each annual USPTO appropriation from FY–91 to the present contains language stating that the appropriated amount would "remain available until expended," meaning that such money can be used in subsequent fiscal years to cover expenses unless Congress sets a particular spending ceiling. See, e.g., Pub.L. No. 106–113, 113 Stat. 1501 (1999) (setting $755 million as an upper limit for FY–00 and rolling over to subsequent fiscal years any excess amount).

The one major difference between the FY–04 text, *supra,* and that from other years is that, from FY–91 through FY–97, none of the appropriation language contained the formula requiring that a certain sum "shall be derived from offsetting collections assessed and collected" or that the sum "appropriated from the general fund shall be reduced as such offsetting collections are received during [the] fiscal year ... so as to result in a final fiscal year ... appropriation from the general fund estimated at $0." That type of mandate appears only since FY–98.

**12.** From FY–91 through FY–04, 3,710,262 patent applications were filed while 2,024,155 patents were issued. See USPTO's annual reports, *available at* http://www.uspto.gov/web/offices/com/annual/index.html; see also Defendant's Appendix ("Def.'s App.") at Tab 49 (Nov. 8, 2004).

**13.** See Pub.L. No. 101–515, 104 Stat. 2101 (1990); Pub.L. No. 102–140, 105 Stat. 782 (1991); Pub.L. No. 102–395, 106 Stat. 1828 (1992); Pub.L. No. 103–121, 107 Stat. 1153 (1993); Pub.L. No. 103–179, 107 Stat.2040 (1993); Pub.L. No. 103–317, 108 Stat. 1724 (1994); Pub.L. No. 104–134, 110 Stat. 1321 (1996); Pub.L. No. 104–208, 110 Stat. 3009 (1996); Pub.L. No. 105–119, 111 Stat. 2440 (1997); Pub.L. No. 105–277, 112 Stat. 2681 (1998); Pub.L. No. 106–113, 113 Stat. 1501 (1999); Pub.L. No. 106–553, 114 Stat. 2762 (2000); Pub.L. No. 107–77, 115 Stat. 748 (2001); Pub.L. No. 108–7, 117 Stat. 11 (2003); Pub.L. No. 108–199, 118 Stat. 3 (2004).

**14.** 15 U.S.C. § 1113 and 35 U.S.C. §§ 41 and 376 relate, respectively, to fees that USPTO may assess for trademark services, patent services, and under the Patent Cooperation Treaty.

Examining the evidence [15] on USPTO finances produces the following results:

| | Congressional Appropriations (Millions) | Total USPTO Program Costs (Millions) | Total Patent Fees Collected (Millions) | Total Fees Collected for All Services (Patents, Trademarks, etc.) (Millions) |
|---|---|---|---|---|
| FY–1991 | $ 91.0 | $ 358.1 | $ 291.4 | $ 344.3 |
| FY–1992 | $ 88.4 | $ 422.4 | $ 363.5 | $ 427.8 |
| FY–1993 | $ 86.7 | $ 471.0 | $ 423.4 | $ 498.4 |
| FY–1994 | $ 103.0 [16] | $ 469.1 | $ 472.3 | $ 541.6 |
| FY–1995 | $ 83.0 | $ 502.3 | $ 557.4 | $ 646.2 |
| FY–1996 | $ 82.3 | $ 553.7 | $ 571.7 | $ 665.2 |
| FY–1997 | $ 61.3 | $ 619.9 | $ 652.0 | $ 755.5 |
| FY–1998 | $ 691.0 | $ 750.6 | $ 775.1 | $ 890.5 |
| FY–1999 | $ 643.0 | $ 861.8 | $ 805.0 | $ 909.3 |
| FY–2000 | $ 755.0 | $ 911.3 | $ 817.4 | $ 956.5 |
| FY–2001 | $ 783.8 | $ 1,016.6 | $ 859.0 | $ 1,040.2 |
| FY–2002 | $ 843.7 | $ 1,161.0 | $ 910.1 | $ 1,061.4 |
| FY–2003 | $1,015.2 | $ 1,206.1 | $1,004.5 | $ 1,162.3 |
| FY–2004 | $1,222.5 | $ 1,289.2 | $1,070.1 | $ 1,239.0 |
| **TOTALS** | **$6,549.9** | **$10,593.1** | **$9,572.9** | **$11,138.2** |

In short, from FY–91, when plaintiff alleges that the diversions began,[17] through FY–04, USPTO has taken in approximately $11.1 billion in fees for patent, trademark, and miscellaneous services, while USPTO's operational expenses have cost the United States approximately $10.6 billion. USPTO, thus, collected approximately $545.1 million more in fees than it spent on operations over the previous fourteen fiscal years, an amount equal to approximately 4.9 percent of its total fee income. The $422.5 million in diversions about which plaintiff specifically complains represent approximately 4.4 percent of the total patent fees, and approximately 3.8 percent of the total fees for all services, that USPTO collected from FY–91 through FY–04.

When reviewing these figures, one must bear in mind that patent fees generally comprise approximately 86 percent of total USPTO fee income, with fees for trademark ser-vices and miscellaneous services making up the difference. In addition, the congressional appropriations cover all USPTO expenses, including its trademark operations and are not limited just to patent expenses. Nevertheless, the figures provide a useful tool for the court's analysis.

The heart of plaintiff's argument is that Congress' diversion of 4.4 percent of the patent fees to non-patent purposes is unconstitutional and constitutes an illegal exaction. In fact, plaintiff argues, the various diversions interfere with USPTO's performance of its critical functions and burden inventors with costs unrelated to securing their patent rights and, thus, are not rationally related to promoting the progress of the useful arts, as required by the Constitution.

Plaintiff cites no authority anywhere in his pleadings to support his argument that Congress' budget practices are unconstitutional, other than the single case of *Boyd* [18] *v. Unit-*

---

15. See Def.'s Supplemental App. at Tab 5 (Feb. 25, 2005); Def.'s App. at Tab 15 (Nov. 8, 2004); Pl.'s App. at 10, 48, 88, 111, 150 (Aug. 20, 2004); see also the appropriation acts cited *supra* in note 13; USPTO annual fiscal year reports, *available at* http://www.uspto.gov/web/offices/com/annual/index.html.

16. The original $88.3 million appropriation was increased. See Pub.L. No. 103–121, 107 Stat.

1153 (1993); see also Pub.L. No. 103–179, 107 Stat.2040 (1993).

17. Amended Complaint ("Am.Compl.") ¶ 3.

18. At oral argument, plaintiff cited the case of "Boyden" without providing further identifying information. Summ. J. Tr. at 7. Since no case of that name appears in any of the motions, and

*ed States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), from which plaintiff draws the following quote: "[I]llegitimate and unconstitutional practices get their first footing ... by silent approaches and slight deviations from legal modes of procedure." [19]

In its cross-motion for summary judgment, defendant asserts, as a general proposition, that the legislation about which plaintiff complains is within Congress' power under the Necessary and Proper Clause in regards to the patent system, the spending power, and also the Commerce Clause.

In particular, defendant first contends that Congress has not permanently withheld, rescinded, or otherwise diverted the patent fees since Congress possesses the inherent power to decide to appropriate the full amount of collected, but unappropriated, fees to USPTO.

Second, defendant argues that Congress is within its Article I powers in deciding how to appropriate patent fees because it is selecting the policy that best effectuates the constitutional aim by rationally managing the patent system it has created. For one thing, patent fee and appropriation legislation is a necessary and proper means of executing the patent power. Congress' only constitutional obligation is to create a patent system, and it has done so by designing a regime where one set of standards governs the requirements of patentability, while the other set of rules governs the patent application process. Defendant also notes that there is no requirement at all that USPTO even exist. Additionally, defendant asserts that the preamble to the Intellectual Property Clause has no application to the procedural requirements for obtaining a patent but, if it has any application at all, it is merely for the requirements of patentability that encourage innovation. Instead, defendant insists that the proper inquiry is whether the patent fee legislation is conducive to and plainly

adopted to serve congressional power to grant patent rights. Having chosen to create USPTO, Congress may also choose how to fund it.

Third, defendant asserts that the Government incurs other USPTO-related costs, such as pension and health insurance benefits, and support expenses for work done by other agencies in support of the USPTO mission, for which the Government pays with funds other than those obligated specifically to USPTO, costs that defendant's expert, in deposition testimony, has estimated to total approximately $3.02 billion since 1971 for health insurance and retirement alone.

Fourth, an applicant's payment of the patent application fee, according to defendant, functions as a waiver of a claim for unlawful exaction since payment of the fee satisfies a condition for application.

Fifth, Congress' powers to regulate commerce and to spend money for the general welfare provide independent grounds for patent fee legislation.

Lastly, defendant declares that Congress has the undoubted authority to oversee the performance of Executive Branch agencies, and it is not for the courts to instruct it how to oversee its creations.

In his reply, plaintiff first avers that the doctrine of the "law of the case" precludes introduction of defendant's Commerce Clause and General Welfare Clause arguments based on the court's previous ruling, *Figueroa,* 57 Fed.Cl. at 501, that it would determine whether the diversion of patent fees to non-patent purposes was necessary and proper to the promotion of the progress of the useful arts. Then, plaintiff argues that, even if the court considered defendant's alternative arguments, they should also fail, since Congress may not do indirectly what the Constitution expressly prohibits.

---

since the only case the court was able to find sharing that name and dealing with patent fees was *Boyden v. Comm'r of Patents,* 441 F.2d 1041 (D.C.Cir.1971), which held that patent fees may not be waived for reasons of indigence, the court believes that plaintiff misspoke and meant the case that he had quoted in his motion, *i.e., Boyd*

*v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

**19.** Pl.'s Mot. at 20 (quoting *Boyd,* 116 U.S. at 636, 6 S.Ct. 524). The actual page number of the *Boyd* quote in the United States Reports is 635.

Second, plaintiff argues that payment of a fee does not constitute a waiver of any right to challenge that fee on the grounds of illegal exaction. Lastly, plaintiff asserts that defendant's description of the rescission of patent fees as "temporary" is a charade.

Alternatively, plaintiff has moved for additional discovery, in the event that the court accepts defendant's argument that Government payments from the general Treasury to cover unfunded USPTO retirement, health, and life insurance benefit costs can offset diversions and rescissions of patent fees. Such additional discovery would be needed, plaintiff asserts, because the first expert deposed by the parties in discovery claimed to have used a "head count ratio" to calculate costs, but later admitted it was actually a full-time equivalent count. The discrepancy between the two counting methods would be material, in plaintiff's view, if the court allows this argument, necessitating further discovery.

For its part, defendant replies that plaintiff's alternative motion for additional discovery is without merit, untimely, and unfair because plaintiff already had discovery on the subject of this motion. Moreover, defendant argues that plaintiff has already admitted to being satisfied with the facts already available on the cost question since plaintiff proposed it himself in his proposed findings of uncontroverted facts. Finally, defendant argues that plaintiff has already had two opportunities to depose the expert on this issue and failed to pursue that possibility.

The American Intellectual Property Law Association ("AIPLA") submitted an *amicus* brief in which it states that it takes no position on plaintiff's request for relief, the question of liability, or the issue of whether the budget legislation that diverts patent fees is unconstitutional. Instead, AIPLA only asks that the court hold that the fee diversion does not promote the progress of useful arts. *Amicus* avers that the patent system of the United States is an engine for economic growth, but argues that diversion of funds leads to increased burdens on USPTO and decreased patent quality. Like plaintiff, *amicus* relies on virtually no authority to supports its basic arguments, except for *El-*

*dred v. Ashcroft*, 537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003), and *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), both of which *amicus* cites in passing in a footnote for the general proposition that the Constitution requires Congress, in enacting intellectual property legislation, to create a system that promotes the progress of science and the useful arts.

### Discussion

Both parties have moved for summary judgment contending that there are no genuine issues of material fact and each moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition.

*Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merits and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

The parties agree that Congress has not permitted USPTO to spend as great a sum of money for its operations as it has collected in fees, but differ as to the exact nature of the diversions of those fees to other purposes. Defendant argues that any diversion of fees is an accounting exercise so any diversions are only "hypothetical," and that any rescission of budget authority was only temporary and *de minimis.* Plaintiff counters that the diversions of fees have been substantial and are permanent. For the purposes of this analysis, this opinion will construe the doubts in plaintiff's favor by assuming that the diversions are permanent and substantial.

### 1. Threshold Issues

#### a. *Illegal Exaction*

Defendant has argued that the payment of patent application and maintenance fees is a condition, the satisfaction of which is necessary to receive the benefit sought, and that voluntary payment of the fees acts as a waiver on any claims that the payor might have. The only case law that defendant cites is this court's earlier holding, *Figueroa,* 57 Fed.Cl. at 502, 505, that a patent-holder must pay fees as a condition of maintaining his patent and that the Government did not hold these fees in trust for the payor.

The jurisdiction of this court under the Tucker Act includes illegal exaction claims, which are those where the claimant seeks the return of all or part of a sum of money he has been improperly required to pay by the Government in contravention of the Constitution, a statute, or a regulation. See *Ont. Power Generation, Inc. v. United States,* 369 F.3d 1298, 1301 (Fed.Cir.2004) (citing *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002 (1967)); see also *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572–73 (Fed.Cir.1996).

Defendant cites no authority for its argument that contradicts the cited cases. In addition, defendant misconstrues the court's earlier holding since the language in the earlier ruling that defendant cites is related to the court's examination of plaintiff's earlier Fifth Amendment takings claim and the nature of the property interest that was allegedly taken. The court's discussion of constructive trusts has no application to the question of whether the Government improperly required plaintiff to pay a fee in violation of the Constitution, the law, or regulations. Therefore, the court rejects this argument.

#### b. *Injunctive Relief*

The Tucker Act defines the jurisdiction of the Court of Federal Claims and grants it jurisdiction to render judgment upon any claim against the United States founded upon the Constitution, any Act of Congress, any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1). The courts have interpreted that statutory language to require "that a plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States,* 160 F.3d 714, 716 (Fed.Cir.1998) (quoting *United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). The court has limited power to grant equitable relief ancillary to claims for monetary relief over which the court has jurisdiction under specific statutory exceptions, *i.e.,* back pay cases and bid protests. *Id.* (citing 28 U.S.C. §§ 1491(a)(2), (b)(2)). The court, however, lacks jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court. *Id.* (citing *Katz v. Cisneros,* 16 F.3d 1204, 1208 (Fed.Cir.1994)).

The Constitution, furthermore, mandates that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. In addition, federal courts may not order the obligation of funds for which there is no appropriation. *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 184 (D.C.Cir. 1992) (citations omitted).

In his prayer for relief, plaintiff requested the court to "[d]eclar[e] the past and continued diversion of patent fees" to be unconstitutional, enjoin any future diversions, and order the return of any diverted fees to USPTO or to plaintiff and other class members. Given the limited power of the court to order injunctive relief, and the court's complete lack of authority to order Congress to spend money, the potential relief that the court may grant potential plaintiffs is limited to ruling on the constitutionality of the diversions and ordering the return to the payors of any fees that were illegally exacted.

### c. Law of the Case

Plaintiff vigorously opposes any presentation by defendant of any theories to justify the diversion of fees other than that they are valid under the Necessary and Proper Clause of the Constitution. Plaintiff claims that using any alternate theories would violate the doctrine of the "law of the case" since the court already held in its prior order, *Figueroa*, 57 Fed.Cl. at 501, that its role in examining plaintiff's illegal exaction claim in further proceedings would be "limited to discerning if Congress' legislation ... was necessary and proper to achieving its constitutional end of 'promot[ing] the Progress of ... useful Arts.'"

The "law of the case" is a judicially created doctrine, the purposes of which are to prevent courts from re-litigating previously decided issues, and to ensure that lower courts adhere to the decisions of higher, appellate

courts. *Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed.Cir.1995). The doctrine requires a court to follow the previous decision on a particular question during the case because a decided question should not be subject to continued argument. *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed.Cir. 1991) (quoting *Jamesbury Corp. v. Litton Indus. Prod., Inc.,* 839 F.2d 1544, 1550 (Fed. Cir.1988)). Since a trial court has the power to reconsider its decisions until judgment is entered, however, the "law of the case" merely requires a trial court to follow the rulings of an appellate court, and does not limit the trial court on issues not actually considered by an appellate court. *Exxon,* 931 F.2d at 877.

Plaintiff has failed to define the "law of the case" as limited to the adherence by a trial court to the decisions of an appellate court, asserting a much broader principle that courts "should not reopen what has been decided." At oral argument, however, plaintiff conceded that the court has the power to reconsider its decisions until the entry of judgment.[20] Moreover, the court's earlier opinion did not consider any legal theories other than the Necessary and Proper Clause, so the court's holding is not, by its plain language, necessarily exclusive of other theories. Thus, the court has the power to consider alternate constitutional theories besides the Necessary and Proper Clause as bases for congressional action under the Intellectual Property Clause although, as will be seen *infra,* there is no need to do so.

### d. Mootness

Defendant argues, in effect, that part of plaintiff's claim is moot since the Office of Management and Budget and the United States Department of the Treasury have "restored" certain diverted fees to USPTO's specially-dedicated Treasury account.[21] That restoration, however, does not aid defendant.

---

20. Summ. J. Tr. at 12.

21. At oral argument, plaintiff's counsel, while stopping short of alleging bad faith, insisted that the Government was incorrect in stating that the money had been returned to the USPTO account, arguing instead, "The money is not there. It's in a computer database." Summ. J. Tr. at 70. The

law presumes that Government officials "perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations," and this legal presumption is "valid and binding" unless the party challenging it can rebut it with "well-nigh irrefragable proof." *Schism v. United States,* 316 F.3d 1259, 1302 (Fed.Cir.2002) (*en banc*) (quoting *Alaska Airlines,*

A defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" since courts would otherwise find themselves forced to leave "[t]he defendant ... free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citations omitted). Thus, a case becomes moot only "if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that the allegedly wrongful behavior could not reasonably be expected to start up again. *Id.*

Defendant has presented no evidence that Congress would be unable to repeat the diversions, if it chose to do so. Therefore, for the purposes of deciding the motions presently before the court, the question of whether or not diverted fees have been restored to the USPTO account is irrelevant.

### 2. Intellectual Property Clause

█ Patents entitle the patentees to exclude others "from making, using, offering for sale, or selling an invention throughout the United States." 35 U.S.C. § 154(a)(1). The right to exclude is meant to encourage "investment-based risk" and is the "fundamental purpose of the patent grant." *Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 599 (Fed. Cir.1985); see also *Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (Economic philosophy behind Intellectual Property Clause is that encouraging "individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'").

The word "patent" derives from the phrase "letters patent," which were public grants under English law of some sort of benefit by the sovereign, as a matter of royal prerogative, to an individual, and which often took the form of gifts of commodities monopolies to court favorites. See *Graham,* 383 U.S. at 5, 86 S.Ct. 684; see also Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Background and Origin of the Intellectual Property Clause of the United States Constitution,* 2 J. INTELL. PROP. L. 1, 10–11 (1994); BLACK'S LAW DICTIONARY at 925, 1156 (8th ed.2004). Parliament acted to curtail the practice of granting monopolies by passing the Statute of Monopolies in 1623, which banned all monopolies and letters patent, except those granting monopolies "of the sole working or making ... of new manufactures," *i.e.,* inventions. Walterscheid at 12–14.

Prior to the adoption of the Constitution, no national patent law had existed in the United States under the Articles of Confederation, and most of the states likewise did not have general patent statutes. See Walterscheid at 16–21. Concern for protecting intellectual property was an issue of "inferior moment" at the Constitutional Convention and, in fact, a discussion of the issue of intellectual property occupies only one paragraph [22] of THE FEDERALIST in the chapter on the miscellaneous powers of the central government. Walterscheid at 24; THE FEDERALIST No. 43 (James Madison). Nevertheless, the delegates decided that the new government should have the power to regulate intellectual property and, mindful of the English experience with abuse of the royal patent prerogative and hesitant to countenance an unlimited national power to create monopoly rights, inserted language that allowed the federal government to grant monopolies only

*Inc. v. Johnson,* 8 F.3d 791, 795 (Fed.Cir.1993); *Lachance v. White,* 174 F.3d 1378, 1381 (Fed.Cir. 1999)). Plaintiff has not provided such proof.

**22.** "The utility of this power [to promote the progress of science and useful arts] will scarcely be questioned. The copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law. The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals. The States cannot separately make effectual provisions for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress." THE FEDERALIST No. 43 (James Madison).

in certain types of cases, *i.e.,* for inventions, as had been the case with the English Statute of Monopolies. See *Graham,* 383 U.S. at 5, 86 S.Ct. 684; see also Walterscheid at 37–38. The result was the Intellectual Property Clause, covering both patents and copyrights, and stating: "The Congress shall have Power ... [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. I, § 8, cl. 8. The Intellectual Property Clause is unique in that it is the only one of the Enumerated Powers where the drafters mandated "a specific mode of accomplishing the particular authority granted," *i.e.,* "by securing exclusive rights for limited times to authors and inventors in their respective writings and discoveries." Walterscheid at 33.

Congress enacted the first national patent law, the Patent Act of 1790, 1 Stat. 110, during the First Congress. *Graham,* 383 U.S. at 6, 86 S.Ct. 684. That law created a three-person patent agency housed in the Department of State, and known as the "Commissioners for the Promotion of Useful Arts." *Id.* at 6–7, 86 S.Ct. 684. The commissioners were the Secretary of State, the Secretary of War, and the Attorney General, any two of whom together could issue a fourteen-year patent to any person who fashioned or discovered a novel invention. See *id.* Since the passage of the first Patent Act, Congress has amended it at least fifty times. *Id.* at 10, 86 S.Ct. 684.

Congress has broad discretion in determining how to implement the Intellectual Property Clause. See *Constant,* 848 F.2d at 1564. This is so because the powers of Congress in the field of intellectual property "are plenary for they stem directly from the Constitution." *Boyden v. Comm'r of Patents,* 441 F.2d 1041, 1043 (D.C.Cir.1971). With specific reference to patents, Congress has required that USPTO grant no patent unless an invention be useful, novel, and non-obvious. See 35 U.S.C. §§ 101–103; see also *Graham,* 383 U.S. at 14, 86 S.Ct. 684. Of these three elements, utility is perhaps the most important since "one may patent only that which is 'useful,' " and since utility has been a key concept in all American patent law since the passage of the first Patent Act. *Brenner v. Manson,* 383 U.S. 519, 528–29, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). Indeed, utility is the only one of the three elements of patentability specifically mentioned in the constitutional text. See U.S. CONST. art. I, § 8, cl. 8.

Plaintiff's central point of argument is his claim that charging inventors fees that are not entirely used solely for the purpose of supporting the operations of the patent system is an irrational, unconstitutional burden on innovation that does not promote the progress of useful arts.[23] He cites, however, no case in support of this proposition.

The Constitution grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the enumerated powers of Article I, § 8, "and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. The Articles of Confederation had specifically precluded granting to the central government any power not expressly delegated by the states. *M'Culloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 406, 4 L.Ed. 579 (1819); Arts. of Confederation art. II ("Each state retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is not by this Confederation *expressly* delegated to the United States, in Congress assembled." (emphasis added)). Unlike the Articles of Confederation, however, the Constitution does not prohibit Congress from exercising "incidental or implied powers," and does not use the word "expressly" when describing the delegation of powers to the federal government. *M'Culloch,* 17 U.S. at 406; U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

"[T]he courts' role in judging whether Congress has exceeded its Article I powers is limited." *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 860 (5th

23. Pl.'s Mot. at 14–15.

Cir.1979). The Constitution, in fact, "does not profess to enumerate the means by which the powers it confers may be executed," but the powers given to the government "imply the ordinary means of [their] execution." *M'Culloch*, 17 U.S. at 408–09. "Within the limits of the constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim. This is but a corollary to the grant to Congress of any Article I power." *Graham*, 383 U.S. at 6, 86 S.Ct. 684 (citing *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23 (1824)). "[T]he Necessary and Proper Clause authorizes Congress, subject to other constraints imposed by the Constitution, to adopt measures that bear a rational connection to any of its enumerated powers." *United States v. Edgar*, 304 F.3d 1320, 1326 (11th Cir.2002); see also *United States v. Plotts*, 347 F.3d 873, 878 (10th Cir.2003); *United States v. Lue*, 134 F.3d 79, 84 (2d Cir.1998). To satisfy constitutional muster, Congress need not choose a particular form of legislation that is "absolutely necessary" to the exercise of an Enumerated Power because the legislation need only be "conducive" to the beneficial exercise of the Enumerated Power and "plainly adapted" to that purpose. See *Jinks v. Richland Co., S.C.*, 538 U.S. 456, 462, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003) (citing *M'Culloch*, 17 U.S. at 414–15, 417, 421); see also *Schnapper v. Foley*, 667 F.2d 102, 112 (D.C.Cir.1981) (quoting *Mitchell Bros. Film Group*, 604 F.2d at 860 (Congress does not exceed its power under Article I, § 8, cl. 18 as long as the means chosen are "appropriate" and "plainly adapted" to achieve a constitutional end)); *Eldred*, 537 U.S. at 212, 123 S.Ct. 769 (to extent Congress enacts intellectual property rights at all, it must create a system that promotes the progress of science, but it is for Congress, not the courts, to determine how to meet the objectives of Article I, § 8, cl. 18).

Under these rules, the court must examine whether the legislation or regulation is appropriate and plainly adapted to achieve the constitutional goal of promoting the useful arts. In other words, the proper inquiry is whether the measure complained of is a rational exercise of the legislative authority under the Intellectual Property Clause. See *Eldred*, 537 U.S. at 204, 123 S.Ct. 769; see also Stephen Gardbaum, *Rethinking Constitutional Federalism*, 74 Tex. L. Rev. 795, 820 (1996) ("To the extent that modern courts ever acknowledge that Congress is exercising power granted by the Necessary and Proper Clause, they have translated [Chief Justice] Marshall's statements [in *M'Culloch v. Maryland*] on the meaning of 'necessary' and the congressional discretion on the degree of necessity into a rational basis test; namely, asking whether Congress' determination that the regulation in question will promote a legitimate federal end was one that could rationally be reached.").

Plaintiff agrees that rational basis is the appropriate standard of review; indeed, at oral argument, plaintiff's counsel discussed the power of Congress to divert fees solely in terms of its rationality, or alleged lack thereof, and did so eighteen separate times.[24] Although "courts have a constitutional duty to scrutinize congressional actions to ensure that Congress stays within its constitutionally enumerated powers," under the rational basis test, they must "discipline [their] scrutiny to ensure that [they] are about the business of judicial review and not the business of social policy." See *United States v. Kirk*, 105 F.3d 997, 999 (5th Cir.1997).

In the Equal Protection context, which provides useful analytical context, when a court employs the rational basis test, it examines whether a challenged law is "rationally related to legitimate governmental objectives." *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). Under the rational basis test, a challenged law is presumed valid, and the party attacking the measure has the burden of proving that it is irrational. See *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 314–15, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted).

The court notes that plaintiff's requested remedy puts him in an odd position with regard to his policy arguments. As plaintiff has asserted passionately in his motions and

24. Summ. J. Tr. at 11, 13, 15, 21, 22–24, 26, 28, 30, 37–38, and 40.

pleadings and at oral argument, the diversion of patent fees to non-patent purposes is allegedly unconstitutional, at least in part, because such diversion interferes with the ability of USPTO to discharge its responsibilities to issue patents in a timely way. Yet, plaintiff basically asks the Government to disgorge money in the form of refunds of fees exacted illegally when one might suppose that the superior policy outcome would be for Congress to decide on its own to return the diverted fund to USPTO's budget. Nevertheless, the court will examine the rationality of Congress' funding of USPTO operations.

*Boyd,* the single case upon which plaintiff has built his argument in his brief, does not aid that argument much since it is not on point. It is also a case that has been largely overruled. See *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). *Boyd* was a case in which a glass importer was accused of using false invoices to avoid customs duties. *Boyd,* 116 U.S. at 617, 6 S.Ct. 524. The Government seized thirty-five cases of plate glass and at trial, the prosecutor compelled the defendant to produce the invoice at issue. *Id.* at 618, 6 S.Ct. 524. Upon judgment of forfeiture, the importer appealed, arguing that the compulsory production of private papers to be used in evidence against him violated the Fourth Amendment as an unreasonable search and seizure. *Id.* The United States Supreme Court ("Supreme Court") agreed and remanded the case with an order for a new trial. *Id.* at 638, 6 S.Ct. 524. The case, however, had nothing to do with intellectual property.

During oral argument, plaintiff's counsel cited *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), as supporting the argument that "there has to be some outer limit to what Congress can do." [25] *Lopez* concerned a high school student who was prosecuted under a federal statute that made it a crime knowingly to possess a firearm in a school zone. *Lopez,* 514 U.S. at 551, 115 S.Ct. 1624. Congress had determined that it could regulate such behavior under the Commerce Clause of the

Constitution, but the Supreme Court held that such a law exceeded the powers of Congress to regulate commerce since possession of a gun in a local school zone was in no sense an economic activity that might substantially affect any interstate commercial activity. *Id.* at 551, 567, 115 S.Ct. 1624. The Court was particularly concerned that the challenged law regulated behavior so far removed from commercial activity that Congress might be tempted to regulate activities left to the states under our federal system of government. See *id.* at 564, 115 S.Ct. 1624.

Also during oral argument, plaintiff's counsel cited *Eldred* as a good illustration of "the analysis that applies when evaluating what Congress' power is to enact laws under the intellectual property clause." [26] In *Eldred,* various parties, whose businesses depended on creative works for which copyright protection had expired, challenged legislation by which Congress had lengthened the term of copyrights so that they generally ran from the time of creation of the work until seventy years after the death of the author. *Eldred,* 537 U.S. at 193, 123 S.Ct. 769. The petitioners did not object to the lengthening of the copyright term, *per se,* but to the extension of the terms of existing copyrights. *Id.* The Supreme Court held that legislation to extend the terms of copyright validity, even when applied to existing copyrights, was rational and that the courts were "not at liberty to second-guess congressional determinations and policy judgments" of that order. *Id.* at 208, 123 S.Ct. 769. Since the policy judgments reflected in the act were of a kind that Congress typically makes, it was appropriate for the courts to defer substantially to Congress. *Id.* at 205, 123 S.Ct. 769.

While both *Lopez* and *Eldred* certainly did discuss the limits of the power of Congress, neither case supports plaintiff's position.

*Lopez* was concerned with the tension inherent in the Commerce Clause between state and federal power and the risk that a broad reading of the Commerce Clause would swallow state sovereignty. The Intellectual Property Clause does not have those

---

**25.** *Id.* at 10.

**26.** *Id.* at 8.

tensions since Congress has the exclusive power, based on an explicit constitutional grant of authority, to reward inventors and authors with monopoly rights in their works. *Eldred,* on the other hand, while implicitly finding, as the court earlier recognized, see *Figueroa,* 57 Fed.Cl. at 501 (citing *Eldred,* 537 U.S. at 210–15, 123 S.Ct. 769), a substantive limit in the preamble to the Intellectual Property Clause to the power of Congress, also was deferential to the power of Congress to make the policy decision necessary to manage the system that regulates intellectual property rights, *Eldred,* 537 U.S. at 212, 123 S.Ct. 769 (it is for Congress, not the courts, to determine how to meet the objectives of the Intellectual Property Clause) (citations omitted).

Significantly, as noted previously, plaintiff has not cited a single case to support its illegal exaction argument in its motion for summary judgment. Rather, plaintiff has cited numerous policy arguments, but intellectual property policy judgments, under *Eldred,* are vested in Congress, and courts must be deferential to Congress' exercise of its power in that sphere. Moreover, under the rational basis test, plaintiff has the heavy burden of showing that USPTO appropriations legislation is neither appropriate nor plainly adapted to achieve the legitimate constitutional objective of promoting the useful arts, *i.e.,* that the legislation was not rationally related to that goal or was inappropriate to the end in view, and plaintiff has failed to do so.

Congressional budgeting can never be more than a guessing game since Congress generally appropriates funds at the beginning of the fiscal year during which they will be needed. Moreover, as plaintiff's counsel conceded at oral argument,[27] Congress has no duty or obligation to spend all the patent fees collected as soon as they are collected. In fact, since patent applications usually take months, if not several years to adjudicate, it would be absurd to require such an outcome since the work could well occur in another fiscal year.

Plaintiff's assertion, made with evocative imagery at oral argument, that the diversion of patent fees is "Queen Elizabeth with her nose under the tent,"[28] *i.e.,* the incipient resurrection of an arbitrary system of government-granted monopolies like that existing in Tudor England, is not supported by the evidence. As discussed *supra* in note 12, USPTO has issued more than 2 million patents since FY–91, and the requirements that a patentable invention be useful, novel, and non-obvious remain in the statutes, conforming to the constitutional command of the Intellectual Property Clause.

In sum, during the past fourteen fiscal years, USPTO has taken in billions of dollars cumulatively in fees and has provided billions of dollars worth of services, most of which involved issuing more than 2 million patents. USPTO appropriations have increased by a factor of thirteen during that timespan. Congress is, thus, funding USPTO operations, and funding them generously, with money assessed in the form of patent fees, although Congress has not dedicated all of the fees to that particular purpose, choosing instead to spend 4.4 percent of those fees on other priorities. Congress' determination of federal spending priorities and how the patent system fits into national economic development goals is an eminently rational exercise of its power.

### Conclusion

Congress is entitled to great deference under the Necessary and Proper Clause when it legislates under its Intellectual Property power. Any intellectual property law Congress passes need only survive the limited scrutiny of the rational basis test as to whether it promotes the progress of science and the useful arts. Plaintiff may well be correct that the current patent fee regime is misguided and creates the wrong incentives, but such policy determinations are for Congress, and not the courts, to make. Plaintiff has not carried his burden of showing that Congress has behaved irrationally.

Having disposed of the case under the Intellectual Property Clause, the court need

27. *Id.* at 73.

28. *Id.* at 40.

not reach defendant's Commerce Clause and General Welfare Clause arguments.

Accordingly, plaintiff's motion for summary judgment on his illegal exaction claim is DENIED. Defendant's cross-motion for summary judgment on plaintiff's illegal exaction claim is GRANTED. Plaintiff's motion for class certification, which the court had stayed in an order dated October 7, 2003, is hereby MOOT.

In addition, since the court decides the illegal exaction claim on the merits based on the broad issue of constitutionality, the question of USPTO pension liabilities is MOOT, and plaintiff's alternative motion for additional discovery is, therefore, DENIED.

The Clerk of the Court shall enter judgment for defendant. No costs.

IT IS SO ORDERED.