William SIMMONS and Viola Simmons,
his wife, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 8609.

United States Court of Appeals
Fourth Circuit.

Argued June 11, 1962.

Decided Aug. 28, 1962.

Sheldon H. Braiterman, Baltimore, Md. (Marvin Braiterman and Louis H. Fried, Baltimore, Md., on the brief), for appellants.

Fred E. Youngman, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Joseph D. Tydings, U. S. Atty., and Robert W. Kernan, Asst. U. S. Atty., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

Diamond Jim III, a rock fish, was one of millions of his species swimming in the Chesapeake Bay, but he was a very special fish, and he occasions some nice legal questions. Wearing a valuable identification tag, he was placed on June 19, 1958, in the waters of the Bay by employees of the American Brewery, Inc., with the cooperation of Maryland state game officials. According to the well-publicized rules governing the brewery-sponsored Third Annual American Beer Fishing Derby, anybody who caught Diamond Jim III and presented him to the company, together with the identification tag and an affidavit that he had been caught on hook and line, would be entitled to a

cash prize of $25,000.00. The company also placed other tagged fish in the Chesapeake, carrying lesser prizes.

Fishing on the morning of August 6, 1958, William Simmons caught Diamond Jim III. At first, he took little notice of the tag, but upon re-examining it a half hour later, he realized that he had caught the $25,000.00 prize fish. After Simmons and his fishing companions appropriately marked the happy event, he hastened to comply with the conditions of the contest. Soon thereafter, in the course of a television appearance arranged by the brewery, he received the cash prize. The record shows that Simmons knew about the contest, but, as an experienced fisherman, he also knew that his chances of landing that fish were minuscule, and he did not have Diamond Jim III in mind when he set out that morning.

Thereupon, an alert District Director of the Internal Revenue Service came forward with the assertion that the cash prize was includable in Simmons' gross income under section 61(a) [1] and section 74(a) [2] of the Internal Revenue Code, 26 U.S.C.A. §§ 61(a), 74(a) and assessed a tax deficiency of $5,230.00. Promptly Simmons paid and filed a claim for refund. A small sum was refunded on the basis of very generous deductions allowed by the Internal Revenue Service. Not satisfied, however, Simmons brought an action in the District Court on the theory that no part of the cash prize can be included in gross income under sections 61(a) and 74(a) of the Internal Revenue Code, or, in the alternative, that the prize falls within the exclusions of either section 74(b), pertaining to certain prizes and awards, or section 102, pertaining to gifts. He also maintained that, if the Internal Revenue Code under-

took to tax such an award, it would offend the taxing provisions of the Constitution. On motion for summary judgment, the District Court held for the Government,[3] and Simmons prosecutes this appeal.

### I.

We turn first to the taxpayer's contention that the prize money is excluded from his gross income by the terms of section 74(b). This subsection specifies the three requirements that must be met in order to qualify for its benefits:

"§ 74. Prizes and awards.

\*    \*    \*    \*    \*

"(b) Exception.—Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement, but only if—

"(1) the recipient was selected without any action on his part to enter the contest or proceeding; and

"(2) the recipient is not required to render substantial future services as a condition to receiving the prize or award." [4]

We do not understand the taxpayer to claim immunity from the tax on the ground that capture of the fish or the award of the prize had any religious, charitable, scientific, educational, artistic, or literary significance whatever. His argument is that the payment was made in recognition of a civic achievement. He attributes a civic purpose to the American Brewery, Inc., in offering a prize the effect of which, he says, is to popularize the recreation and resort facilities of the state of Maryland. Yet it requires a considerable flight of fancy to romanticize the Fishing Derby into a

---

1. "§ 61. Gross income defined.
   "(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *."

2. "§ 74. Prizes and awards.
   "(a) General rule.—Except as provided in subsection (b) and in section 117 (re-

lating to scholarships and fellowship grants), gross income includes amounts received as prizes and awards."

3. 197 F.Supp. 673 (D.Md.1962).

4. See Max Isenbergh, 31 T.C. 1046, 1052 (1959); Treas.Reg. § 1.74–1(b).

civic endeavor. A glance at the advertisements announcing first the Derby and later the capture of Diamond Jim III unmistakably reveals that the purpose of the contest and of the prize was to stimulate the sale of American beer.

■ But even if a civic purpose could be discerned in the company's campaign, we are of the opinion that it is not the motivations of the donor that are legally relevant. The statute and its legislative history [5] speak only of the character of the recipient's achievement, and the crucial test is the nature of the activity being rewarded. For example, if Simmons' achievement cannot be considered one of those enumerated in section 74(b), the exclusion provided in that section would not apply even if the prize were given by the state of Maryland to further a promotional campaign for its facilities. Conversely, if the recipient's achievement were "civic" in the sense of the statute, he would be entitled to its benefits even though the donor had a commercial purpose in making the award.

■ The taxpayer advances the further argument that a jury could reasonably find that the payment was for a civic achievement since it rewarded his skill as a fisherman, and that it was therefore error to refuse to permit the jury to determine the issue. To agree that these facts present a jury question would distort both the basic concept of the statutory exclusion and the meaning of the language used.

■ While dictionary definitions are not an infallible guide to the exact meaning of statutory language, they may limit the range of possible meanings. The

word "civic" is defined as "[r]elating, pertaining, or appropriate, to a citizen."[6] One may be said to be a civic person if he merely lives in a state and quietly obeys its laws, but a "civic achievement" involves more. It implies positive action, exemplary, unselfish, and broadly advantageous to the community. This interpretation of the phrase is reinforced by a consideration of the other types of achievement singled out in section 74(b). While the class of civic achievements is not limited to the others specifically enumerated, it must resemble them in general character, and they all represent activities enhancing in one way or another the public good. Although the qualifying word "civic" is the last in the enumeration of achievements, it should not be treated as a limitless extension of the previously enumerated classes, for that would erase all distinctions and make the exclusion almost as broad as the taxing provision of subsection (a). Moreover, the statute's legislative history indicates that only awards for genuninely meritorious achievements were to be freed from taxation. Thus, Nobel and Pulitzer prizes were there cited as examples of awards to be within the exclusionary provisions of section 74(b), while prizes given in "radio and television giveaway shows, or as door prizes, or in any similar type contest" were to be taxed as income.[7]

■ Viewing the facts most favorably to the taxpayer, we hold that he was not rewarded for a civic achievement, properly interpreted. There was nothing meritorious in a civic sense in catching this rock fish. Simmons was not even

5. H.R.Rep. No. 1337, 83d Cong., 2d Sess. (1954), reprinted in 3 U.S.Code, Cong. & Ad.Law News, pp. 4017, 4036, 4163 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess. (1954), reprinted in 3 U.S.Code, Cong. & Ad.Law News, pp. 4621, 4642, 4813 (1954).

6. Webster, New International Dictionary 492 (2d Ed. 1954).

7. S.Rep. No. 1622, 83d Cong., 2d Sess. (1954), reprinted in 3 U.S.Code, Cong. & Ad.Law News, pp. 4621, 4813 (1954).

This legislative history reveals that section 74 was passed to obviate the results of Pauline C. Washburn, 5 T.C. 1333 (1945) (prize given by Pot O'Gold radio show held a gift and nontaxable), and McDermott v. Commissioner, 80 U.S.App. D.C. 176, 150 F.2d 585 (1945) (Ross Essay prize awarded by American Bar Association held a gift and nontaxable), and to modify and clarify the law in this area. See Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 290 n. 12, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

rewarded for an extraordinary display of skill, if that could be considered a civic achievement, for catching Diamond Jim III was essentially a matter of luck. The case might be different if, for example, Simmons had at considerable risk to himself captured and destroyed a killer whale terrorizing the Maryland seashore. That could have been regarded as a genuine civic achievement. But catching this fish cannot reasonably be so denominated, for the only community interest in the event was one of idle curiosity. Innumerable are the rhapsodies uttered in praise of the delights and virtues of the piscatorial pastime, but never to our knowledge has it been seriously called a civic enterprise. The character of this fortuitous event is not raised to a civic level by being linked to an advertising campaign aimed at selling beer. Far from resembling a Nobel or Pulitzer prize-winner, Mr. Simmons fits naturally in the less-favored classification the legislators reserved for beneficiaries of "giveaway" programs.

## II.

The taxpayer's next point is that he was at least entitled to have a jury decide whether the $25,000.00 payment to him was a gift, excluded from gross income by section 102.[8] The Supreme Court's exposition of this branch of the law in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190 (1960), is of course controlling, and this court expressed its understanding of that decision in Poyner v. Commissioner, 301 F.2d 287 (4th Cir. 1962). Here it suffices to repeat that it is the function of the trier of fact to determine the basic facts and from these to infer the motivations of the donor. This does not mean, however, that in an appropriate case a district judge may not make a decision on summary judgment. Where, from the facts stipulated and submitted on affidavit, when viewed in the light most favorable to the taxpayer, it plainly appears that a jury could not reasonably infer that the payments were motivated "out of affection, respect, admiration, charity or like impulses," [9] or from a "detached or disinterested generosity," [10] or from similar sentiments, summary judgment for the Government is the correct disposition. Such is the present case.

The established fact is that there was no personal relationship between Simmons and the brewery to prompt it to render him financial assistance. Nor was it impelled by charitable impulses toward the community at large, for the prize was to be paid to whoever caught Diamond Jim III, regardless of need or affluence. Rather, the taxpayer has apparently rendered the company a valuable service, for, by catching the fish and receiving the award amid fanfare, he brought to the company the publicity the Fishing Derby was designed to generate.

Moreover, under accepted principles of contract law on which we may rely in the absence of pertinent Maryland cases, the company was legally obligated to award the prize once Simmons had caught the fish and complied with the remaining conditions precedent. The offer of a prize or reward for doing a specified act, like catching a criminal, is an offer for a unilateral contract.[11] For the offer to be accepted and the contract to become binding, the desired act must be performed with knowledge of the of-

---

8. "§ 102. Gifts and inheritances.
   "(a) General rule.—Gross income does not include the value of property acquired by gift, bequests, devise, or inheritance."

9. Robertson v. United States, 343 U.S. 711, 714, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952), quoted in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

10. Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 246, 76 S.Ct. 800, 100 L.Ed. 1142 (1956), quoted in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

11. See 6A Corbin, Contracts § 1489 (1962); Restatement, Contracts § 521 (1932).

fer.[12]  The evidence is clear that Simmons knew about the Fishing Derby the morning he caught Diamond Jim III. It is not fatal to his claim for refund that he did not go fishing for the express purpose of catching one of the prize fish. So long as the outstanding offer was known to him, a person may accept an offer for a unilateral contract by rendering performance, even if he does so primarily for reasons unrelated to the offer.[13]  Consequently, since Simmons could require the company to pay him the prize, the case is governed by Robertson v. United States, 343 U.S. 711, 713–714, 72 S.Ct. 994, 96 L.Ed. 1237 (1952). There, the Supreme Court held that, since the sponsor of a contest for the best symphonies submitted was legally obligated to award prizes in accordance with his offer, the payment made was not a gift to the recipient.[14]

### III.

Having shown that the payment does not fall within any statutory exclusion, it remains to consider whether it is income within sections 61(a) and 74(a) and whether the Constitution confers upon Congress the power to tax this money.  It is necessary first to examine the source of the Congressional taxing power, its scope and its limitations, to demonstrate that the appellant's position is untenable.

The power to tax is conferred on Congress by article I, section 8, clause 1 of the Constitution,[15] but other sections of the Constitution impose certain restrictions upon the manner in which the taxing power of the Federal Government may be exercised.  In addition to the general limitations placed upon that power by the due process clause of the Fifth Amendment, Congress is specifically prohibited from laying any tax on the export of goods;[16] whatever indirect taxes it may enact shall be "uniform throughout the United States";[17] and it may impose a capitation or direct tax only if apportioned among the states according to population.[18]  This last restriction, the only one pertinent to the present case,

12. 1 Corbin, Contracts § 59 (1950); Restatement, Contracts § 53 (1932).

13. 1 Corbin, Contracts § 58 (1950); Restatement, Contracts § 55 (1932).

14. Accord, United States v. Amirikian, 197 F.2d 442 (4th Cir. 1952).  It might be argued that Robertson is distinguishable from the present case, for here the contract might be legally unenforceable as a wagering contract since it depends upon the happening of the fortuitous event of catching Diamond Jim III.  See note 11, supra.  Under Maryland law, it is far from clear whether the contract would be unenforceable, see Wroth v. Johnson, 4 Har. & McH. 284 (1799); Bennett v. Mutual Fire Ins. Co., 100 Md. 337, 340, 60 A. 99, 101 (1905); Farmers' Milling & Grain Co. v. Urner, 151 Md. 43, 134 A. 29 (1926); Kahn v. Schleisner, 165 Md. 106, 166 A. 435 (1933); LaFontaine v. Wilson to Use of Ugast, 185 Md. 673 45 A.2d 729, 162 A.L.R. 1218 (1946); but, even if it were, the tax treatment of the payment actually made to Simmons would not be affected.  In view of the extensive campaign advertising the Fishing Derby and the cash prizes, the company was under a strong moral duty to make good on its promises: and any attempt to treat the payment as a gift must fail "if the payment proceeds primarily from 'the constraining force of any moral or legal duty.'"  Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), quoting from Bogardus v. Commissioner, 302 U.S. 34, 41, 58 S.Ct. 61, 82 L.Ed. 32 (1937).  Moreover, the fact that gains originated from unenforceable wagering contracts has never prevented their inclusion in the recipient's gross income.  See Tavares v. Commissioner, 275 F.2d 369 (1st Cir. 1960); Winkler v. United States, 230 F.2d 766 (1st Cir. 1956); Campodonico v. United States, 222 F.2d 310, 314 (9th Cir. 1955); 1 Mertens, Federal Income Taxation § 4.11 (1956).

15. "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; * * *."

16. United States Constitution, art. I, § 9, cl. 5.

17. United States Constitution, art. I, § 8, cl. 1.

18. "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." United States Constitution, art. I, § 9, cl. 4.

has been limited in scope by the Sixteenth Amendment which permits taxes "on incomes, from whatever source derived" without regard to the apportionment requirement.[19]

■ Proceeding to the case before us, it is apparent that the basic grant of taxing power under article I, section 8, clause 1, is broad enough to embrace the power to tax the sum received by Simmons, for we are taught that the clause is all-inclusive, embracing "every form of tax appropriate to sovereignty."[20] It is equally plain that Congress has not apportioned among the states the tax imposed by sections 61 and 74. Therefore, the taxpayer can establish his contention that the tax imposed is invalid under the Constitution only by showing, first, that the tax is direct and therefore requires apportionment, and second, that the tax does not fall within the scope of the Sixteenth Amendment which lifts the apportionment requirement from such categories of taxes on income as are deemed to be direct taxes. We find that neither showing has been made.[21]

■ 1. A direct tax is a tax on real or personal property, imposed solely by reason of its being owned by the taxpayer. A tax on the income from such property, such as a tax on rents or the interest on bonds, is also considered a direct tax, being basically a tax upon the ownership of property.[22] Yet, from the early days of the Republic, a tax upon the exercise of only some of the rights adhering to ownership, such as upon the use of property[23] or upon its transfer,[24] has been considered an indirect tax, not subject to the requirement of apportionment. The present tax falls into this latter category, being a tax upon the receipt of money and not upon its ownership.

This tax is similar to others held to be indirect. In the case which on its facts most nearly resembles the present one, Scholey v. Rew, 90 U.S. (23 Wall.) 331, 346–348, 23 L.Ed. 99 (1875), the Supreme Court upheld a federal death tax, placed upon persons receiving real property from a deceased under a will or by intestate succession, against the claim that the tax was an unapportioned direct tax on property. In that case, as in the present, the tax was borne directly by the recipient, but was held to be mere-

19. "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." United States Constitution, amendment XVI.

20. Steward Machine Co. v. Davis, 301 U.S. 548, 581, 57 S.Ct. 883, 888, 81 L.Ed. 1279 (1937); see Brushaber v. Union Pac. R. R., 240 U.S. 1, 12, 36 S.Ct. 236, 60 L.Ed. 493 (1916).

21. The taxpayer actually bases his constitutional argument upon the assertion that "[o]ne of the restrictions on the taxing powers of Congress, which has not been removed by the Sixteenth Amendment is the simple inability of Congress to tax as income that which is not income." But if Congress has the power to impose the tax in question, it is not material that it calls the tax one on income, for it has been clearly established that the labels used do not determine the extent of the taxing power. See Eisner v. Macomber, 252 U.S. 189, 206, 40 S.Ct. 189, 64 L.

Ed. 521 (1920); Penn Mut. Indem. Co. v. Commissioner, 277 F.2d 16, 20 (3d Cir. 1960). The taxpayer is also mistaken in assuming that all taxes on income are valid only by reason of the Sixteenth Amendment. Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 on rehearing, 158 U.S. 601, 637, 15 S.Ct. 912, 39 L.Ed. 1108 (1895), itself recognized that taxes on income derived from "business, privileges, employments, and vocations" were indirect taxes and therefore would be valid without apportionment and without any constitutional amendment.

22. Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, on rehearing, 158 U.S. 601, 627–628, 15 S.Ct. 912, 39 L.Ed. 1108 (1895).

23. Hylton v. United States, 3 U.S. (3 Dall.) 171, 1 L.Ed. 556 (1796) (tax on carriages for the conveyance of persons).

24. Fernandez v. Wiener, 326 U.S. 340, 352–355, 361–362, 66 S.Ct. 178, 90 L.Ed. 116 (1945) (estate tax on community property at death of one spouse).

ly upon the transfer of property. The Scholey case was by name reaffirmed in Knowlton v. Moore, 178 U.S. 41, 78–83, 20 S.Ct. 742, 44 L.Ed. 969 (1900), and by implication in New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921), both cases upholding federal estate taxes imposed, not upon the beneficiary but upon the decedent's estate. A tax upon the donor of an inter vivos gift was held to be an indirect tax in Bromley v. McCaughn, 280 U.S. 124, 135–138, 50 S.Ct. 46, 74 L.Ed. 226 (1929). If a tax on giving property is indirect, so would be a tax on receiving it, regardless of its source. That no distinction may be drawn between giving and receiving was pointed out in Fernandez v. Wiener, 326 U.S. 340, 352–355, 361–362, 66 S.Ct. 178, 90 L.Ed. 116 (1945), where the Supreme Court upheld as an indirect tax the federal estate tax on community property at the death of one spouse: "If the gift of property may be taxed, we cannot say that there is any want of constitutional power to tax the receipt of it, whether as a result of inheritance [citation omitted] or otherwise, whatever name may be given to the tax * * *. Receipt in possession and enjoyment is as much a taxable occasion within the reach of the federal taxing power as the enjoyment of any other incident of property." [25]

While the distinctions drawn in these cases may seem artificial, the necessity for making them stems from the structure of the Constitution itself, which distinguishes between direct and indirect taxes. The Supreme Court has restricted the definition of direct taxes to the above-enumerated well-defined categories, and we have no warrant to expand them to others.

2. Even if we were to assume that the tax upon Simmons is direct, it comes within the Sixteenth Amendment, which relieved direct taxes upon income from the apportionment requirement. ·We need look no further than the two most recent Supreme Court cases in this area. In Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955), the Court upheld the inclusion in gross income of money received by the taxpayers as punitive damages, stating that "[h]ere we have instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431, 75 S.Ct. at 477. This test was specifically reaffirmed in James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), where the Court considered the taxability of embezzled money. The plunder was held to be income solely because it came into the taxpayer's possession and control and despite the fact that he had no right to it and indeed was under a legal obligation to return it to its rightful owner. This obligation to repay was deemed irrelevant, for a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." [26] As is apparent from the quoted statements, and as illustrated by the diverse factual situations in these cases, it is the status in the recipient's hands of the money being taxed which is the crucial factor, while the source of the money is not relevant.

The $25,000.00 received by Simmons squarely meets these tests laid down by the Supreme Court. The receipt of this sum constitutes an economic gain over

---

25. 326 U.S. at 353, 66 S.Ct. at 185. Analogous too are cases holding that a tax on the gross receipts of a business is an indirect tax, but, being a tax on business, this is more like the traditional excise tax, expressly treated by the Constitution as not direct. Spreckels Sugar Ref. Co. v. McClain, 192 U.S. 397, 410–413, 24 S.Ct. 376, 48 L.Ed. 496 (1904); Stanton v. Baltic Mining Co., 240 U.S. 103, 114, 36 S.Ct. 278, 60 L.Ed. 546 (1916) (alternative holding); Penn Mut. Indem. Co. v. Commissioner, 277 F.2d 16, 18–20 (3d Cir. 1960), affirming 32 T.C. 653 (1959).

26. Rutkin v. United States, 343 U.S. 130, 137, 72 S.Ct. 571, 96 L.Ed. 833 (1952), quoted in James v. United States, 366 U.S. 213, 219, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961).

which he has complete control and, better than the situation in James, complete legal right. Whether the money came to Simmons as a gift, or as a return for services, or for some other reason, it still is income to him.[27]

It might be contended that reliance cannot properly be placed upon the Glenshaw and James decisions because they purport to interpret the meaning of "income" only as used in section 61 of the Internal Revenue Code and not as used in the Sixteenth Amendment. However, the opinions in both cases show that the Supreme Court was aware of the constitutional issues. In Glenshaw, these were dismissed in a single sentence. 348 U.S. at 429, 75 S.Ct. at 475. In James, the constitutional issues were unmistakably brought to the Court's notice by the dissent of Mr. Justice Whittaker. 366 U.S. at 248, 81 S.Ct. at 1070. His sole objection was that the taxpayer had no legal right to the money, and therefore, in his opinion, there was no economic gain that could be constitutionally taxed. This feature of the controversy in James is not present in our case because Simmons enjoys a permanent economic benefit, not subject to any claim of restitution. None of the several opinions of the Justices in James intimates a doubt of the constitutional validity of a tax upon a true gain.

Moreover, the constitutional and the statutory provisions are closely related. The language of section 61, a paraphrase of the Sixteenth Amendment, "was used by Congress to exert in this field the full measure of its taxing power." [28]

This means that Congress intended to avail itself to the utmost of the exemption granted it by the Sixteenth Amendment from the requirement of article I, section 8, clause 1, that direct taxes shall be apportioned. Thus, the Court, in upholding taxes on income imposed by section 61 which might also be direct taxes, necessarily decides that such taxes are authorized by the Sixteenth Amendment. And conversely, from our conclusion here that Simmons received income within the meaning of that amendment, it necessarily follows that it is taxed by sections 61(a) and 74(a).

Affirmed.

---

27. Eisner v. Macomber, 252 U.S. 189, 40 S. Ct. 189, 64 L.Ed. 521 (1920), upon which the taxpayer relies, held only that a tax on a 50% stock dividend was a direct tax on property and was not income within the scope of the Sixteenth Amendment, defined as "the gain derived from capital, from labor, or from both combined." 252 U.S. at 207, 40 S.Ct. at 193. In the Glenshaw case, Mr. Chief Justice Warren qualified the Eisner v. Macomber definition of income: "In that context —distinguishing gain from capital—the definition served a useful purpose. But it was not meant to provide a touchstone to all future gross income questions." 348 U.S. at 431, 75 S.Ct. at 476, 477.

28. Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 429, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955); H.R.Rep. No. 1337, 83d Cong., 2d Sess. (1954), reprinted in 3 U.S.Code, Cong. & Ad.Law News pp. 4017, 4155 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess. (1954), reprinted in 3 U.S.Code, Cong. & Ad.Law News, pp. 4621, 4802 (1954).