# United States Court of Appeals for the Federal Circuit

05-5144

MIGUEL FIGUEROA,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Heath W. Hoglund, Hoglund & Pamias, P.S.C., of San Juan, Puerto Rico and Robert H. Rines, Rines & Rines, of Concord, New Hampshire argued for plaintiff-appellant.

Brian A. Mizoguchi, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief was Michael B. Briskin, Associate Counsel, United States Patent and Trademark Office, of Arlington, Virginia.

Appealed from: United States Court of Federal Claims

Senior Judge Bohdan A. Futey

# United States Court of Appeals for the Federal Circuit

05-5144

MIGUEL FIGUEROA,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

———————————————

DECIDED: October 11, 2006

———————————————

Before NEWMAN, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Opinion concurring in the judgment filed by <u>Circuit Judge</u> NEWMAN.

DYK, <u>Circuit Judge</u>.

This is a suit for a refund of patent fees alleged to have been unlawfully exacted. The appellant, Miguel Figueroa ("Figueroa"), contends that the statutory patent fees imposed on him in 2001 and 2002 for filing his patent application and issuing his patent violated art. I, § 8, cl. 8 of the United States Constitution (the "Patent Clause"), because the statute was designed to generate revenue to fund federal programs other than the United States Patent and Trademark Office ("PTO").  Figueroa also contends that the fees constituted an impermissible direct tax in violation of art. I, §§ 2 & 9, cl. 4 (the "Direct Tax Clauses").  The Court of Federal Claims granted summary judgment for the United States on the first claim and dismissed the second.  We affirm.

BACKGROUND

The principal issue in this appeal is whether Congress may constitutionally impose patent fees in an amount above what is used to fund the PTO. The pertinent facts are not in dispute.

I

Congress has imposed fees on the grant of patent rights since the first Patent Act in 1790. Under the 1790 Act, patent fees totaled roughly $5. 1 Stat. 109, 112 (1790). Patent fees did not total more than $100 until 1965, when Congress increased the statutory patent application fee to $65 and the statutory patent issuance fee to a minimum of $112. Pub. L. No. 89-83, 79 Stat. 259 (1965).[1] In 1980, Congress for the first time required periodic patent maintenance fees. Pub. L. No. 96-517, § 2, 94 Stat. 3015 (1980). The 1980 legislation established "the Patent and Trademark Office Appropriation Account" in the treasury and required that all patent fee revenues be credited to that account. Id. That account continues in existence to this day.

In 1982, Congress set the patent application fee at $300, the patent issuance fee at $500, and the patent maintenance fees at $400 due three years and six months after issuance, $800 due seven years and six months after issuance, and $1,200 due eleven

---

[1] In the 1793 Patent Act, Congress increased total patent fees to approximately $30. 1 Stat. 318, 323 (1793). Patent fees remained stable until 1861, when Congress imposed separate patent application and issuance fees, set at $15 and $20, respectively. 12 Stat. 246, 248 (1861). Congress increased those fees to $20 each in 1922, 42 Stat. 389, 393 (1922), $25 each in 1930, 46 Stat. 155 (1930), and $30 each in 1932. 47 Stat. 382, 410 (1932). In the Patent Act of 1952, Congress established the PTO but did not raise patent fees. Pub. L. No. 82-593, 66 Stat. 792 (1952).

years and six months after issuance. Pub. L. No. 97-247, § 3(a)-(b), 96 Stat. 317, 317-18 (1982).

In the Omnibus Budget Reconciliation Act of 1990 ("OBRA"), Congress imposed a sixty-nine percent surcharge on top of both patent application and issuance fees. Pub. L. No. 101-508 § 10101(a), 104 Stat. 1388, 1388A-391 (1990). The surcharge expired at the end of fiscal year ("FY") 1998. Pub. L. No. 103-66, § 8001, 107 Stat. 312, 402 (1993).

For FY 1999 Congress increased the statutory patent application fee to $760, increased the statutory patent issuance fee to $1,210, and increased patent maintenance fees to $940, $1,900, and $2,910 due at the previously established time intervals. Pub. L. No. 105-358, § 3(a)-(b), 112 Stat. 3272, 3273-74 (1998). For FY 2000 Congress set patent application, issuance, and maintenance fees at their current levels: $690 for the application fee, $1,210 for the issuance fee, and $830, $1,900, and $2,910, respectively, for the maintenance fees. Pub. L. No. 106-113, § 4202, 112 Stat. 1501, 1501A-554 (1999). The patent fee structure is set forth in 35 U.S.C. § 41 (2000).[2]

Failure to pay application or issuance fees is treated as an abandonment of the application, 35 U.S.C. §§ 111(a)(4), 151 (2000); failure to pay required maintenance fees results in expiration of the patent, 35 U.S.C. § 41(b).

The heart of this case concerns Congress's decision not to appropriate all of the fees collected to fund PTO operations. Between FY 1991 and FY 1999 Congress in its

---

[2] Congress has established a slightly different scheme for trademark fees. Though deposited into the same special treasury account as patent fee revenue, 35 U.S.C. § 42(b) (2000), trademark fee revenue may be used only to fund the PTO's trademark operations. 42 U.S.C. § 42(c). There is no such limitation on the expenditure of patent fee revenue.

appropriations bills had made patent fee revenue (with the exception of surcharge revenue) "available [to the PTO] until expended." See, e.g., Pub. L. No. 108-199, 118 Stat. 3 (2004).[3] Beginning in FY 1999, Congress limited the amount of patent fee revenue the PTO was authorized to spend. See, e.g., Pub. L. No. 105-358, § 3(b), 112 Stat. 3272, 3273-74 (1998). As a result, some patent fee revenue was not available to the PTO. Figueroa refers to Congress's withholdings of patent fee revenue as "diversions" of that revenue.

Also beginning in FY 1999 Congress enacted a series of "rescissions" of PTO authority to spend revenues from patent fees and redirected the revenue to other purposes.[4] Congress rescinded roughly $71 million in FY 1999 for use in deficit reduction, Pub. L. No. 105-277, 112 Stat. 2681 (1998), roughly $1 million in FY 1999 to offset subsidies to the steel, coal, and oil industries, Pub. L. No. 106-51, § 202, 113 Stat. 258 (1999), roughly $3 million in FY 2000 to offset spending on a variety of federal programs, Pub. L. No. 106-113, Appx. E § 301(a), 113 Stat. 1501, 1501A-303 (1999), and roughly $1 million in FY 2002 to offset appropriations for homeland security programs, Pub. L. No. 107-206 § 1403(a), 116 Stat. 820, 898 (2002).

Between FY 1991 and FY 2004, the PTO collected roughly $11.1 billion in total fee revenue (including surcharge revenue) while its operational costs only totaled around $10.6 billion, for a surplus of approximately $545.1 million. The Court of Federal

---

[3] Beginning with FY 1992, Congress withheld surcharge revenue from PTO appropriations, allowing Congress to utilize these funds for other programs.

[4] A rescission is a legislative withdrawal of the PTO's budgetary authority to spend a portion of the fee revenue collected during the fiscal year.

Claims found that from FY 1992 to the present, at least $422.5 million in patent fee revenue has been directed to non-PTO spending.

Figueroa alleges that the following table represents the total amounts of diverted and rescinded patent fees for FYs 1999 through 2004 (numbers are in millions):

| Fiscal Year | Total Patent Fee Receipts | Total Patent Fee Appropriations | Net Patent Fees Unavailable | Additional Patent Fee Rescissions | Total Patent Fees Diverted and Rescinded |
|---|---|---|---|---|---|
| 1999 | $887 | $853 | $34 | $72 | $106 |
| 2000 | $1,006 | $886 | $120 | $3 | $123 |
| 2001 | $1,085 | $1,039 | $46 | - | $46 |
| 2002 | $1,145 | $1,121 | $24 | $1 | $25 |
| 2003 | $1,194 | $1,182 | $12 | - | $12 |
| 2004 | $1,321 | $1,223 | $99 | - | $99 |

Since FY 1991, PTO operations have been funded entirely by fee revenue. However, PTO employee benefits, including pensions, health insurance, and life insurance, which are administered by the Office of Personnel Management ("OPM"), have been funded from the general treasury.[5]

II

Figueroa filed a patent application on February 27, 2001, and paid the statutory application fees. On August 7, 2001, he filed a complaint in the Court of Federal Claims, seeking to recover the fees paid, as well as declaratory and injunctive relief barring future allegedly illegal exactions of patent fees.[6] He alleged that the fees

---

[5] The PTO received general appropriations for employee benefit services totaling approximately $179 million for FYs 1997 through 2003.

[6] In addition, Figueroa sought to certify a class of similarly situated individuals who had paid patent fees. The Court of Federal Claims stayed the class

established by the patent fee statute exceeded Congress's power under the Patent Clause, constituted an unapportioned direct tax on intellectual property in contravention of the Direct Tax Clauses, and constituted a Taking under the Fifth Amendment. He argued that, as a consequence of Congress's allegedly unlawful diversions and rescissions of patent surcharge and patent fee revenue, the PTO now is underfunded to the point that it cannot keep up with the volume of patent applications. Figueroa subsequently paid the patent issuance fee, and on November 26, 2002, was issued United States Patent No. 6,484,923. The parties and the Court of Federal Claims treated Figueroa's complaint as seeking recovery of the issuance fee as well the application fee.

The government moved to dismiss Figueroa's claims pursuant to Rules of the Court of Federal Claims 12(b)(1) and 12(b)(6). The court (Judge Bohdan A. Futey) held that Figueroa had standing but dismissed Figueroa's Direct Tax claim for failure to state a claim pursuant to Rule 12(b)(6), concluding that the patent fees were a condition for obtaining an intellectual property right rather than a tax on existing property. The court also rejected Figueroa's takings claim, relying on our holding in Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1329 (Fed. Cir. 2001) (en banc), that "the Takings Clause does not apply to legislation requiring the payment of money." The court denied the government's motion to dismiss Figueroa's Patent Clause claim, construing it as a claim for an illegal exaction over which it had jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2000). Figueroa and the government then filed cross-motions for

---

certification issue pending the resolution of dispositive motions. The court later held that claims accruing before August 8, 1995, were barred by the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501 (2000). The motion for class certification was denied as moot when the court granted summary judgment for the government.

05-5144                                    6

summary judgment on the Patent Clause claim. Figueroa argued that the Clause required that Congress's imposition of patent fees "promote the Progress of . . . useful Arts," and that increasing fees to fund non-PTO programs violated this requirement. The Court of Federal Claims granted summary judgment for the government. The Court held that the Patent Clause's preambular "promotion" language imposes an enforceable limit on Congress's authority and assumed that the diversions and rescissions of patent fee revenue were "permanent and substantial," Figueroa v. United States, 66 Fed. Cl. 139, 146 (2005), but concluded that Figueroa had failed to establish that there was no rational relation between Congress's use of the fee revenue and the promotion of the useful arts.

Figueroa timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2000).

## DISCUSSION

We review the Court of Federal Claims' Rule 12(b)(6) dismissal and its grant of summary judgment without deference. Moyer v. United States, 190 F.3d 1314, 1317-18 (Fed. Cir. 1999); Alves v. United States, 133 F.3d 1454, 1456 (Fed. Cir. 1998).

I

In both the Patent Clause and Direct Tax claims, Figueroa's primary claim is that the patent fees he paid to the PTO were unlawfully exacted because Congress may only charge fees used to fund the PTO.[7] He also alleges that Congress unconstitutionally diverted patent fee revenue to fund non-PTO programs. He therefore

---

[7] Figueroa does not raise his takings claim on appeal.

seeks a determination that Congress's excess fees were unconstitutional, a refund of patent fees he paid in 2001 and 2002, and an injunction barring future diversions.

As a threshold matter, and as the Supreme Court recently reiterated, we have an obligation to assure ourselves of Figueroa's standing under Article III of the Constitution. DaimlerChrysler Corp. v. Cumo, 126 S. Ct. 1854, 1860 (2006). To establish standing, a plaintiff must show that he suffered an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely redressable by a favorable judicial decision. Id. at 1861; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Allen v. Wright, 468 U.S. 737, 751 (1984).

Figueroa suffered an injury-in-fact from actually paying patent fees. This injury is both traceable to the challenged conduct of charging fees in excess of that required to fund the PTO and redressable by a judicial award of a refund upon a finding that this conduct was unconstitutional. Figueroa thus has standing to challenge the legality of the fees that he paid. But Figueroa does not have standing to challenge the diversion of the fees once paid, except to the extent that the diversions are alleged to render the exaction of fees unconstitutional.

We proceed to consider Figueroa's claim that the fees he paid were unlawfully exacted.

II

Figueroa contends that the patent fees that he paid in 2001 and 2002 exceeded Congress's power under the Patent Clause for two separate reasons: first, he asserts that Congress cannot impose fees that exceed the cost of operating the PTO; and

second, he claims that even if Congress can do so, there is no rational relationship between the fees imposed and the costs of running the patent system.

A

The Patent Clause, art. I, § 8, cl. 8 of the Constitution, provides, in pertinent part:

That Congress shall have the power . . . [t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries[.]

U.S. Const., art. I, § 8, cl. 8. The Constitution also empowers Congress to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States." U.S. Const., art. I, § 8, cl. 18. Figueroa argues that the phrase "to promote the progress of science and useful arts" in the Patent Clause creates an independently enforceable substantive limitation on Congress's authority under the Clause.

In Eldred v. Ashcroft, 537 U.S. 186 (2003), the Supreme Court addressed the scope of Congress's authority under Article I, § 8, clause 8, as it relates to copyrights. The petitioner in Eldred argued that the 1998 Copyright Term Extension Act,[8] which extended the duration of existing and future copyrights by 20 years, exceeded Congress's authority under the clause. Eldred, 537 U.S. at 195-96. The petitioner contended that "the [statute's] extension of existing copyrights does not 'promote the Progress of Science,' as contemplated by the preambular language of the Copyright Clause . . . [which] identifies the sole end to which Congress may legislate." Id. at 211. The Court assumed, without deciding, that the preambular language imposed a limitation on Congress's authority. However, the Court rejected the petitioner's

---

[8]     Pub. L. No. 105-298, § 102(b) & (d), 112 Stat. 2827-28 (1998).

contention that the extension of copyright terms was categorically beyond Congress's power under the Clause, based on "an unbroken congressional practice" of enacting such extensions dating back to the first Congress in 1790. Id. at 199-200.

The Supreme Court in Eldred went on to consider whether there was a rational basis for the legislation. It upheld the challenged legislation, finding rational bases for the conclusion that it "promotes the Progress of Science." Id. These included making United States copyright law consistent with that of other nations, see id. at 205-06, encouraging "copyright holders to invest in the restoration and public distribution of their works," id. at 207, and responding to "increases in human longevity and . . . the substantially increased commercial life of copyrighted works resulting from the rapid growth in communications media," id. at 207 n.14.

Like the Supreme Court in Eldred, we assume, without deciding, that the Patent Clause's preambular language limits congressional authority to actions necessary and proper to "promot[ing] the progress of science and useful arts," and that this limitation is judicially enforceable. Unlike the Court of Federal Claims, we do not read any decision of the Supreme Court or our court as being to the contrary.[9]

B

We reject Figueroa's contention that the fees were categorically beyond Congress's power under the Patent Clause because Congress under that Clause cannot impose fees that exceed the costs of operating the PTO.

---

[9] See Figueroa, 57 Fed. Cl. at 499-500. The issue was not presented in either Stiftung v. Renshaw PLC, 945 F.2d 1173, 1180 (Fed. Cir. 1991), or Brenner v. Manson, 383 U.S. 519, 528-29, 530-33 (1966). And, the Court in Eldred rejected the notion that such a limitation was established in Graham v. John Deere Co., 383 U.S. 1, 6 (1966). See Eldred, 537 U.S. at 211-12.

It is axiomatic that Congress is constitutionally empowered to create, administer, and maintain a "patent system." Graham v. John Deere Co., 383 U.S. 1, 6 (1966). "Within the limits of the constitutional grant, the Congress may . . . implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim." Id. It is well established that "Congress may set out conditions and tests for patentability." Id.[10] Patent fees are a condition on the grant of a patent right; failure to pay the required fees results in denial of a patent. 35 U.S.C. §§ 41, 111; see also Boyden v. Comm'r of Patents, 441 F.2d 1041, 1043 (D.C. Cir. 1971). Fees have been an accepted condition of patentability since the first patent statute was enacted in 1790. 1 Stat. 109, 112. Funding the patent system with patent fee revenue is clearly within Congress's authority.

Contrary to Figueroa's argument, the Patent Clause does not limit fees that Congress may impose to the amounts directly appropriated for operating the PTO. The patent system that Congress has established need not be, and is not, limited to the PTO. United States ex rel. Bernardin v. Duell, 172 U.S. 576, 583 (1899) ("[C]ongress may provide such instrumentalities in respect of securing to inventors the exclusive right to their discoveries as in its judgment will be best calculated to effect that object."). Indeed, we have previously explained that the Constitution does not require "even that there be a PTO." Constant v. Advanced Mirco-Devices, Inc., 848 F.2d 1560, 1564 (Fed. Cir. 1998). Thus, for example, in the process of construing the Patent Act's non-obviousness provision, the Supreme Court in Graham expressly recognized that the federal courts have a role in "the administration of the patent system," insofar as courts

---

[10] See also Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 494 (1900); McClurg v. Kingsland, 42 U.S. (1 How.) 202, 206 (1843).

share with the PTO the task of enforcing the requirements for patentability. Graham, 383 U.S. at 6, 18.[11] Moreover, Congress may constitutionally impose fees for patent application and issuance to serve a purpose other than raising revenue. As the Court recognized in Eldred, Congress may legitimately seek to advance other public policy goals related to the objectives of the Patent Clause by enacting legislation pursuant to the Clause. See Eldred 537 U.S. at 205-07.

We conclude that Congress under the Patent Clause is not limited to enacting legislation to fund the PTO. We thus turn to the second step in the Eldred analysis: whether the fees imposed satisfy the rational basis requirement.

C

In deciding whether the legislation was permissible under the Patent Clause, we accord great deference to Congress's policy determinations. Graham, 383 U.S. at 6; Eldred, 537 U.S. at 204-205. As the Court reiterated in Eldred, "judicial review of legislation enacted . . . pursuant to Article I authorization" is limited to determining whether Congress's actions were "a rational exercise of the legislative authority conferred by the [Patent] Clause." Eldred, 537 U.S. at 204, 218. The question thus is whether there is a rational relationship between the present level of patent fees and Congress's legitimate objectives under the Patent Clause. Eldred, 537 U.S. at 212-13.

---

[11] See also Duell, 172 U.S. at 583 ("[S]ince 1870 [Congress] has asserted the power to avail itself of the courts of the District of Columbia" to carry out its Patent Clause authority); id. (Chapter 7, § 2 of the 1790 patent statute, 1 Stat. 109, "authorized the issue of patents by the secretary of state, the secretary for the department of war, and the attorney general."); Constant, 848 F.2d at 1564 ("Congress was fully within its constitutional power when it delegated power to the courts in 35 U.S.C. § 282 to adjudicate the validity of patents in infringement suits.").

05-5144                                    12

Figueroa argues that Congress's <u>reason</u> for enacting fees at their present levels—the desire to generate additional revenue to fund non-PTO programs—renders the fees irrational and therefore unconstitutional. We disagree. The question, rather, is whether there is a rational basis on which Congress <u>could</u> conclude that the level of fees served legitimate congressional objectives. In the Equal Protection context, the Supreme Court has held that, for purposes of rational basis review, "[w]here . . . there are plausible reasons for Congress's action . . . . [i]t is . . . 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision[.]'" <u>U.S. R.R. Retirement Bd. v. Fritz</u>, 449 U.S. 166, 179 (1980) (quoting <u>Flemming v. Nestor</u>, 363 U.S. 603, 612 (1960)). The same test applies in this context. In <u>Eldred</u>, the Supreme Court, in conducting its rational basis review, did not limit itself to the policy justifications that Congress articulated. <u>See</u> 537 U.S. at 206 ("[P]rovid[ing] greater incentive for . . . authors to create and disseminate their work in the United States," though not specifically articulated by Congress, was a rational basis for the legislation.).

Under this standard it is clear that the fee legislation at issue here had a rational basis for at least three separate reasons, any one of which is sufficient to satisfy the constitutional requirement. First, it was rational for Congress to impose the fees to fund the overall patent system. The costs of that system are not limited to the direct costs of operating the PTO. The direct costs appropriated by Congress for operating the PTO do not include employee benefits costs for PTO personnel, which are paid from general treasury funds under the "Commerce, Justice, State, the Judiciary, and Related

Agencies" appropriations category.[12]  Figueroa admits that those costs are substantial,

averaging in excess of $27.5 million per year for FYs 1999 through 2003.  In addition,

costs of executive oversight for the PTO and other aspects of the patent system by the

Commerce Department are not included in the PTO appropriation.[13]  Finally, there are

the costs of operating the federal court system, which provides a forum for resolving

patent disputes, both on appeals from PTO actions and in private infringement litigation.

The appellant here has not even attempted to quantify these other costs of operating

the patent system or made any effort to show that they are disproportionate to the

revenue raised from patent fees that is not directly appropriated to the PTO.

Figueroa complains that the actual dollars collected were not used to fund the

patent system.  The Patent Clause imposes no dollar-for-dollar traceability requirement.

Even if the particular revenues are not directly used for the system, the fees bear a

rational relationship to the cost of running the patent system.

Second, even if the fees collected exceeded these secondary costs of operating

the patent system within any given year, Congress also could have rationally concluded

that increased patent fees were necessary to keep pace with the likely future costs of

administering the PTO and the patent system.[14]  PTO operating costs have increased

---

[12]     The government's expert stated in a deposition that he estimated health and retirement benefit costs for PTO employees since 1971 at around $3.02 billion.

[13]     The Department of Commerce is responsible for PTO policy management. 35 U.S.C. § 1(a) (2000) ("In carrying out its functions, the United States Patent and Trademark Office shall be subject to the policy direction of the Secretary of Commerce.").

[14]     As the Court of Federal Claims noted, "Congress has no duty or obligation to spend all the patent fees collected as soon as they are collected.  In fact, since patent applications usually take months, if not several years to adjudicate, it would be absurd

05-5144                                    14

by over $800 million since FY 1991 alone. Congress cannot know in advance precisely how much patent fee revenue will be generated in any given fiscal year; thus Congress could rationally decide to set patent fees at a level high enough to ensure sufficient funding for the patent system even if Congress knew that, in some years, fee revenue might exceed PTO operating costs. Indeed, because the costs of PTO operations in issuing and maintaining patents are incurred over a number of years, Congress could rationally conclude that patent fees should be set in amounts designed to provide sufficient revenue to carry over into subsequent fiscal years and offset future costs. Even assuming the rescissions were permanent, the vast majority of diverted patent fee revenue remains available for later years. On at least one occasion, Congress has appropriated funds from prior years to the PTO. Pub. L. No. 106-42, 113 Stat. 217 (1999).

Finally, even if fees exceeded the existing and predicted costs of operating the patent system, Congress could also rationally decide to set fees above what is needed to meet the funding needs of the PTO in order to deter the filing and prosecution of certain types of patent applications. The Supreme Court has recognized that Congress may legitimately impose taxes or fees in order to discourage undesirable behavior. See Dep't of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 780-81 (1994); Nat'l Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 341 (1974).

Congress could rationally seek to discourage applications for patents that would later likely be found invalid. Congress could also rationally seek to discourage patent applications for inventions where the patent is sought only for the sake of personal

---

to require such an outcome since the work could well occur in another fiscal year." Figueroa, 66 Fed. Cl. at 152.

recognition.[15]  And, Congress could rationally decide to discourage patent applications from inventors who seek the patent only as a means of inhibiting innovation by competitors.[16]  Congress could also rationally conclude that increasing patent fees would discourage the filing of such applications because those applications lack commercial potential.

We conclude that a rational relationship exists between the fees established and the operation of the patent system, and thus that summary judgment for the government was appropriate on Figueroa's Patent Clause claim.  In the light of our conclusion that the fees are constitutional under the Patent Clause, we need not address the government's contention that, even if the Patent Clause imposes some substantive limitation on Congress's authority, it does not limit Congress's authority to impose

---

[15]    Congress in 1830 considered increasing patent fees to discourage meritless applications.  See 6 Gale & Seaton's Register of Debates in Congress 377 (21st Cong., 1st Sess. 1830).  Congress has more recently heard testimony advocating increased patent fees for the same purpose: "We believe that certain types of fees . . . can be reasonably tailored to foster best practices.  Establishing fees to ensure that applicants will pay the actual costs of the effort required on the part of the PTO to examine applications could have the salutary effect of discouraging applicants from needlessly filing inordinately large numbers of claims and excessively long patent specifications."  Statement of Michael K. Kirk, American Intellectual Property Law Association, to the House Judiciary Committee, July 18, 2002, 2002 WL 1587908; see also Mark A. Lemley, Rational Ignorance at the Patent Office, 95 Nw. U. L. Rev. 1495, 1506 (2001) ("[S]ome patents are issued, especially to individuals, not because they have any market value but simply because the applicant really wants a patent on his invention, no matter how little commercial value it is likely to have."); id. at 1508-10 (suggesting that increasing the costs of patent prosecution to inventors may deter undesirable applications).

[16]    See id. at 1516 ("[P]otential competitors or follow-on innovators might be deterred from entering the field by the existence of patents owned by their competitors."); see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 146 (1989) ("From their inception, the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy.").

patent fees because Congress has plenary power to impose such fees under the General Welfare and Commerce Clauses.

II

Figueroa next contends that the PTO's assessment of present-level patent fees amounted to an unconstitutional Direct Tax, and thus an unlawful exaction, insofar as those fees were used to fund non-PTO programs. Article I, section 2, clause 3 of the Constitution provides that "direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers." U.S. Const. art. I, § 2, cl. 3. The Constitution also provides that "[n]o Capitation, or other direct, Tax shall be laid, unless in the Proportion to the Census or Enumeration herein before directed to be taken." Id. art. I, § 9, cl. 4. Since patent fees are uniform for all patentees regardless of their state of residence, Figueroa contends, they constitute an unapportioned direct tax in violation of Article I, section 9, clause 4.

It is doubtful that the patent fees, paid for the privilege of securing a patent grant, should be viewed as taxes rather than payments for a privilege. See Boyden, 441 F.2d at 1043 (One "is privileged to seek the [patent] monopoly only upon compliance with the conditions which Congress has imposed . . . [including] the payment of fees required for the administration of the patent laws."). However, we conclude that, even if patent fees constitute a tax on intellectual property, they are an excise tax rather than a direct tax and need not be apportioned.

Figueroa argues that patent rights are personal property, and that the Supreme Court's decision in Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429 (1895) ("Pollock I"), established that unapportioned taxes levied on personal property may constitute

unlawful direct taxes. We agree in both respects. However, in <u>Union Electric Co. v. United States</u>, 363 F.3d 1292 (Fed. Cir. 2004), we examined <u>Pollock I</u> and its successor case, <u>Pollock v. Farmers' Land & Trust Co.</u>, 158 U.S. 601 (1895) ("<u>Pollock II</u>"), at length. We held that <u>Pollock I</u> and <u>Pollock II</u> stand for the proposition "that the only impermissible direct tax on personal property is a general tax on broad classes of personal property." 363 F.3d at 1302.

So too in <u>Union Electric</u> we held that "a tax imposed upon the acquisition, ownership, or use of particular kinds of categories of property that falls short of being a general tax on the whole of an individual's personal property"—is an <u>excise</u> tax which need not be apportioned. <u>Id.</u> at 1304. It follows that patent fees, to the extent they are a tax on patent rights, are an excise tax: the fees are levied upon the acquisition and ownership of patent rights. Patent rights are a "particular kind" of personal property. 35 U.S.C. § 261 (2000).[17] A tax on patents, therefore, is like other taxes on specific categories of personal property that the Supreme Court has sustained against direct tax challenges. Examples include taxes on community property, <u>Fernandez v. Wiener</u>, 326 U.S. 340, 362 (1945), gifts, <u>Bromley v. McCaughn</u>, 280 U.S. 124, 138 (1929), estate assets, <u>N.Y. Trust Co. v. Eisner</u>, 256 U.S. 345 (1921), mine production, <u>Stanton v. Baltic Mining Co.</u>, 240 U.S. 103 (1916), foreign-built yachts, <u>Billings v. United States</u>, 232 U.S. 261 (1914), stock sale contracts, <u>Thomas v. United States</u>, 192 U.S. 363, 370 (1904), proceeds from sugar refining, <u>Spreckels Sugar Ref. Co. v. McClain</u>, 192 U.S. 397 (1904), proceeds from tobacco production, <u>Patton v. Brady</u>, 184 U.S. 608 (1902),

---

[17] <u>See also</u> <u>eBay v. MercExchange, L.L.C.</u>,126 S. Ct. 1837, 1840 (2006); <u>Consolidated Fruit-Jar Co. v. Wright</u>, 94 U.S. 92, 96 (1876); <u>Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.</u>, 284 F.3d 1323, 1329 (Fed. Cir. 2002).

legacies and distributive shares of personal property, <u>Knowlton v. Moore</u>, 178 U.S. 41, 83 (1900), and carriages, <u>Hylton v. United States</u>, 3 U.S. (3 Dall.) 171 (1796). These taxes were upheld because they were "carefully tailored tax[es] . . . levied upon only one particular kind of personal property." <u>Union Elec.</u>, 363 F.3d at 1302. The same is true here even if the fees may be fairly equated to a tax.[18]

We conclude that Figueroa's direct tax claim was properly dismissed.

## CONCLUSION

For the foregoing reasons, the decisions of the Court of Federal Claims are affirmed.

## AFFIRMED

## COSTS

No costs.

---

[18] Patent application and issuance fees may also be viewed as taxes on the transfer of the patent right to the patentee. We have held that a tax on the transfer of property does not constitute a direct tax. <u>Nationsbank of Tex., N.A. v. United States</u>, 269 F.3d 1332, 1335 (Fed. Cir. 2001).

# United States Court of Appeals for the Federal Circuit

05-5144

MIGUEL FIGUEROA,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

NEWMAN, <u>Circuit Judge</u>, concurring in the judgment.

Although Mr. Figueroa's petition is not without merit, I conclude that he has not met the extremely heavy burden of establishing that congressional actions violate the Constitution. It may be that additional data in support of his various arguments could shift the balance, but on the record before us, I agree that the judgment of the Court of Federal Claims must be affirmed. However, I do not share the reasoning of the panel majority. I would affirm on the ground applied by the Court of Federal Claims, ruling that Congress is not acting irrationally.

The Court of Federal Claims compared the amount of funds that were diverted from the PTO, with the government's very rough estimate of the additional patent-related costs

that are paid out of general government funds, including the PTO employee retirement expenses that are paid by OPM, the costs to the Department of Commerce as the parent agency of the PTO, the costs of judicial dealings with patent matters, of patent exclusion activities of the Customs Service and the International Trade Commission, and miscellaneous other items. The Court of Federal Claims concluded that Mr. Figueroa had not shown that the diverted funds exceeded these total costs. I agree that the evidence did not clearly establish that Congress was extracting more money from patentees than the government spends in administering the system. Thus his potentially viable constitutional arguments of illegal exaction and improper taxation were not demonstrated so clearly and convincingly as to establish a constitutional violation.

Mr. Figueroa also makes a strong argument that the unduly high fees are a burden on the constitutional purpose to promote the useful arts. Although without doubt the patent system should not be unnecessarily burdened, the absence of quantification and hard evidence of the effect of the fee structure weakens the constitutional force of this argument.

Although I agree that the dismissal must be affirmed, I cannot join in the panel majority's reasoning. The panel majority concedes that there must be a rational basis between the congressional diversion of the PTO fees and the constitutional purpose of promoting the useful arts; the majority opinion speculates about what such a rational basis might be, and recites with approval the theory that the imposition of higher than necessary fees will "deter the filing and prosecution of certain types of patent applications without commercial potential." Indeed, one occasionally hears the gibe that people will obtain a

patent simply for the glory of hanging a beribboned document on the wall. Although generally tongue-in-cheek, and never heard from inventors and investors, the panel majority includes it as serious justification for the higher fees that enable the ensuing fee diversion. However, Congress' actual goals are stated in the budgetary diversion, and do not include those postulated by the panel majority. The beneficiaries of the diverted PTO collections are identified in the congressional action, such as the $77 million diverted to homeland security in 2004. It is not pretended that any of the recipients of the diverted funds has a rational relationship to the constitutional charge to promote the progress of the useful arts.

Mr. Figueroa argues cogently that high fees place a burden on patent-supported investment and disclosure and development. Economists stress the importance of patent-type structures in commercial risk analysis and entrepreneurship. When the patent fee structure was realigned in 1982 to include fees to be assessed after the patent has issued, that is, the "maintenance" fees levied at 3½, 7½, and 11½ years after grant, the purpose was to place the increased burden of patent administrative costs on those patents that achieve commercial value. Mr. Figueroa is correct that the fee structure was never intended to provide government income to fund unrelated activities. See 35 U.S.C. §41 (authorizing the Director of the PTO to set fees "to recover the estimated average cost to the Office of such processing, services, or materials"). However, as the income increased from maintenance fees, the PTO came to be viewed as a kind of "profit center" for the

05-5144                                                    3

support of unrelated government projects.  Meanwhile, the backlog of the PTO is rapidly

increasing,[1] and expanded services remain unfunded.

Mr. Figueroa's argument based on the constitutional mandate is elaborated in

Graham v. John Deere Co., 383 U.S. 1 (1966):

> At the outset it must be remembered that the federal patent power stems from a specific constitutional provision which authorizes the Congress "To promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries."  Art. I, § 8, cl. 8.  The clause is both a grant of power and a limitation.  . . .  The Congress in the exercise of the patent power may not overreach the restraints imposed by the stated constitutional purpose.

383 U. S. at 5-6 (footnote and citations omitted).  The Court has also explained that

congressional enactments implementing the Patent and Copyright Clause must be

"rationally related" to the constitutional objective.  See, e.g., Eldred v. Ashcroft, 537 U.S.

186, 212-13 (2003) (considering whether lengthening the copyright term has a rational

basis to "promoting the progress of science").  The panel majority has inaptly applied the

"rational basis" criterion, for although it is surely rational for Congress to raise money to

support the government, the diverted PTO fees are not used to support activities having

any relation to the progress of science and the useful arts.  Thus United States Railroad

Retirement Board v. Fritz, 449 U.S. 166 (1980) does not support the diversion, for in that

---

1    The Commissioner of Patents recently explained that the application backlog is now approximately one-million and rising, and the first action on the merits pendency in some art units exceeds ten years.    http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/chicagoslides_back.ppt.

case the Court observed that Congress had not articulated its legislative purpose, whereas here the destination of the diverted PTO collections is plainly stated.

The government argues that its right to divert the PTO fee income is absolute, and is supported by the broad powers of Congress to tax and to spend. Mr. Figueroa responds that this diversion is no more than a direct tax on inventors, and violates the constitutional prohibition of direct taxes that are not apportioned. The Court of Federal Claims lumped all of the PTO collections together, and held that they are not a tax. A more rigorous analysis shows that the amount of the fees that are allocated to support PTO services are not an unapportioned tax; however, the amount that is diverted to support other government activity can readily be viewed as an unapportioned direct tax, and prohibited by Article I, section 9, clause 4 ("No Capitation, or other direct, tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.") (modified by the Sixteenth Amendment, authorizing the levy of income tax). As was explained in Simmons v. United States, 308 F.2d 160 (4th Cir. 1962):

> A direct tax is a tax on real or personal property, imposed solely by reason of its being owned by the taxpayer. A tax on the income from such property, such as a tax on rents or the interest on bonds, is also considered a direct tax, being basically a tax upon the ownership of property. Yet, from the early days of the Republic, a tax upon the exercise of only some of the rights adhering to ownership, such as upon the use of property or upon its transfer, has been considered an indirect tax, not subject to the requirement of apportionment.

Id. at 166 (citations omitted). The federal government cannot assess an unapportioned tax on the ownership of property.

The panel majority finds that the PTO fees are not direct taxes but are excise taxes. I doubt that this is correct as a matter of law. In my view, however, the entire cost of

government patent operations is relevant to whether the diversion is unconstitutional as an unapportioned direct tax.

Mr. Figueroa, an inventor, has expressed valid concern for the nation's prosperity and vigor as derived from advances in science and technology. He exhorts optimum support of the PTO's assignment, to implement the constitutional purpose. His constitutional arguments are not devoid of merit, and warrant deeper exploration than they have thus far received.